**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

INDUSTRIAL ENGINEERING &
DEVELOPMENT, INC., ET AL.,

   Plaintiffs,

v.               Case No. 8:12-cv-691-T-24-MAP

STATIC CONTROL COMPONENTS,
INC.,

   Defendant.
_____/

## ORDER

   This cause comes before the Court on the claim construction brief of
Plaintiffs/Counterclaim Defendants Industrial Engineering & Development, Inc., Innovative
Cartridge Technologies, Inc., Cartridge Corporation of America, Inc., American Imaging
Cartridge, LLC; and Universal Imaging Holdings, LLC (collectively, "Industrial"), [Doc. 72],
and the response brief of Defendant/Counterclaimant Static Control Components, Inc. ("Static"),
[Doc. 78].  Also before the Court is Static's claim construction brief, [Doc. 70], and Industrial's
response thereto, [Doc. 79].  The Court held a claim construction hearing on May 16, 2013.

## I. BACKGROUND

   The patents-in-suit belong to Industrial and relate to printer toner cartridges designed to
work with multiple printers.  U.S. Patent No. 7,187,874 (the '874 patent), titled "Toner Cartridge
Having A Printer-Detecting Universal Printer Chip," primarily teaches the structural and
mechanical features of a printer cartridge, enabling interoperation with multiple printers that
have different features added by printer manufacturers to prevent use of a competitor's toner
cartridge.  Steven Miller is the inventor of the '874 patent, which is a divisional application of

his U.S. Patent No. 7,136,608 (the '608 patent), titled "Removable Toner Cartridge Universal Adapter."

U.S. Patent No. 7,356,279 (the '279 patent), titled "Universal Imaging Cartridge," teaches a printer chip, or microcontroller, that can store, generate, and communicate data for activating printers with different electronic identification features added by manufacturers. Miller is the inventor of the '279 patent, which is a continuation of U.S. Patent No. 7,286,774 (the '774 patent), titled "Universal Printer Chip" and filed by Miller and Herman Schnell, which is a continuation-in-part of the '608 patent.

U.S. Patent No. 7,551,859 (the '859 patent), titled "Multiple Region Printer Chip," is similar to the '279 patent but it addresses the perceived problem of manufacturers practicing "regional lockout" to prevent use of a toner cartridge in multiple geographic regions. Miller and Schnell are the inventors of the '859 patent, which is a continuation-in-part of the '874 and the '774 patents.

On March 30, 2012, Industrial filed a complaint alleging Static breached the parties' cross-license agreement by failing to pay Industrial royalties for the use of Industrial's patents. [Doc. 1]. On October 4, 2012, Static filed its amended answer, in which it asserts a counterclaim for declaratory judgment of non-infringement of the following Industrial patents: the '874 patent, the '279 patent, the '859 patent, the '774 patent, and U.S. Patent No. 7,221,886. [Doc. 25].[1] On May 9, 2013, Industrial filed an amended complaint, adding Count II for declaratory judgment of invalidity of the following Static patents: Patent No. 7,088,928 (the '928 Patent) and Patent No. 7,254,346 (the '346 Patent).

The parties now seek construction of disputed terms in the '874 patent, the '279 patent,

---

[1] On May 9, 2013, Industrial filed an amended complaint, adding Count II for declaratory judgment of invalidity of the following Static patents: Patent No. 7,088,928 ('928 Patent) and Patent No. 7,254,346 ('346 Patent).

and the '859 patent.  The Court held a claim construction hearing on these disputed claims on May 16, 2013.

The Court notes that, on February 14, 2008, Static and Innovative filed a complaint against Future Graphics, LLC alleging infringement of Industrial's '874 and '774 patents and Static's '928 and '346 patents.  *See Static Control Components, Inc. and Innovative Cartridge Technologies v. Future Graphics, LLC,* Case No. 1:08-cv-1 09 (M.D.N.C. 2008).  Although not binding on this Court, the *Future Graphics* court construed several of the same disputed terms to be construed in this case. [Doc. 72, Ex. D (construing "signal receiving means," "data base," and "printer family")].  After the *Future Graphics* court issued a claim construction order, the parties settled and dismissed the case.

## II.   LEGAL FRAMEWORK

The construction of a patent is determined by the Court as a matter of law. *Markman* v. *Westview Instruments, Inc.,* 517 U.S. 370, 372 (1996).  The Court primarily considers the intrinsic record, which consists of the claims, specification, and prosecution history.

In construing claims, the Court first looks to the claim language, because "the claims themselves provide substantial guidance as to the meaning of the claim terms," and the claim language defines the claim's scope. *Phillips v. AWH Corp.,* 415 F.3d 1303, 1314 (Fed. Cir. 2005).  Claim terms must be construed so as to be consistent with the specification, which is usually "the single best guide to the meaning of a disputed term." *Phillips,* 415 F.3d at 1321 (citing *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996)).  However, it is improper to limit the claim's scope to a preferred embodiment or specific examples disclosed in the specification.  *See Phillips,* 415 F.3d at 1323; *Laitram Corp. v. NEC Corp.,* 163 F.3d 1342, 1347 (Fed. Cir. 1998) ("claims, not the written description, define the scope of the patent right").

Claims are "generally given their ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention," unless the specification or prosecution history indicates a contrary meaning. *Phillips,* 415 F.3d at 1312-13 (internal citations and quotation marks omitted). Specifically, "[t]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Id.* at 1316. "In other cases, the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor. In that instance as well, the inventor has dictated the correct claim scope, and the inventor's intention, as expressed in the specification, is regarded as dispositive." *Id.*

In addition the intrinsic record, the Court may consider extrinsic evidence, such as dictionaries, to assist it in determining the meaning or scope of terms in a claim. *Id.* at 1318. However, a dictionary definition must not "contradict any definition found in or ascertained by a reading of the patent documents." *Vitronics,* 90 F.3d at 1584, n.6. "Because words often have multiple dictionary definitions, some having no relation to the claimed invention, the intrinsic record must always be consulted to identify which of the different possible dictionary meanings of the claim terms in issue is most consistent with the use of the words by the inventor." *Tex. Digital Sys., Inc. v. Telegenix, Inc.,* 308 F.3d 1193, 1203 (Fed. Cir. 2002). Further, "[i]f more than one dictionary definition is consistent with the use of the words in the intrinsic record, the claim terms may be construed to encompass all such consistent meanings." *Id.*

However, the Court may not need to consult a dictionary to determine the meaning of well-known or commonplace terms. *See C.R. Bard, Inc. v. U.S. Surgical Corp.,* 388 F.3d 858, 863 (Fed. Cir. 2004) (courts "regularly forgo detailed dictionary analyses if the term is . . .

commonplace . . . and determine the ordinary meaning of terms without referring to a dictionary"). Nor must the Court "repeat or restate every claim term." *U.S. Surgical Corp. v. Ethicon, Inc.,* 103 F.3d 1554, 1568 (Fed. Cir. 1997). Claim construction "is not an obligatory exercise in redundancy" but "a matter of resolution of disputed meanings and technical scope to clarify and when necessary to explain what the patentee covered by the claims." *Id.*; *see C.R. Bard* 388 F.3d at 863 ("merely rephrasing or paraphrasing the plain language of a claim by substituting synonyms does not represent genuine claim construction") (quotation marks omitted).

A final claim construction principle relevant to this case relates to the means-plus-function limitation under 35 U.S.C. § 112, ¶ 6, which provides:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification or equivalents thereof.

This paragraph "allows a patentee to recite a function to be performed as a claim limitation rather than reciting structure or materials for performing that function." *Omega Eng'g, Inc. v. Raytek Corp.,* 334 F.3d 1314, 1321 (Fed. Cir. 2003). A claim's use of the word "means" triggers a presumption that it is a means-plus-function claim, but this presumption may be overcome if the claim either recites no function or recites sufficient structure for performing that function. *Rodime PLC v. Seagate Tech., Inc.,* 174 F.3d 1294, 1302 (Fed. Cir. 1999).

After determining that Section 112, ¶ 6 applies, the Court follows a two-step approach to construe the means-plus-function claim. *See Baran v. Med. Device Techs., Inc.*, 616 F.3d 1309, 1316 (Fed. Cir. 2010). The first step is to identify the function recited by the claim. *Id.* "[O]rdinary principles of claim construction govern interpretation of the claim language used to describe the function." *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.,* 296 F.3d 1106, 1113

(Fed. Cir. 2002).   The Court's construction may not adopt a "function different from that explicitly recited in the claim."  *JVW Enter., Inc. v. Interact Accessories, Inc.,* 424 F.3d 1324, 1331 (Fed. Cir. 2005) (citation and quotation marks omitted).   "The claims, not specification embodiments, define the scope of patent protection." *Kara Tech. Inc. v. Stamps.com Inc.,* 582 F.3d 1341, 1348 (Fed. Cir. 2009).  Thus, "it is improper to narrow the scope of the function beyond the claim language," or "to broaden the scope of the claimed function by ignoring clear limitations in the claim language." *Cardiac Pacemakers,* 296 F.3d at 1113.

The second step is to determine the corresponding structure in the written description that performs those functions. *See Baran*, 616 F.3d 1309 at 1316.  A structure is corresponding "only if the specification or the prosecution history clearly links or associates that structure to the function recited in the claim." *Omega Eng'g,* 334 F.3d at 1321.

## III.    CLAIM CONSTRUCTION

### A.  THE '874 PATENT

#### 1.  Means-Plus-Function: "signal receiving means" (Claims 1 and 53)

The term "signal receiving means" appears in claim 1 and claim 53.  These two claims are similar—both claim a printer toner cartridge comprising, *inter alia*, a circuit board and a signal receiving means—except claim 1 is directed to interoperation with multiple printer families and claim 53 is directed to interoperation with multiple printer brands.  For the purpose of clarity, the Court will conduct separate means-plus-function analyses for each claim.

The parties agree that "signal receiving means" is written in means-plus-function language.  They also agree that the signal receiving means must perform multiple claimed functions.  However, the parties disagree on several issues.  First, they disagree on the number of claimed functions.  For claim 1, Static contends the claimed means has four functions; Industrial

contends there are three.  For claim 53, Static contends the claimed means has three functions; Industrial contends there are two.  Second, the parties disagree on whether and how to construe the meaning of the claim language used to describe each function.  Static contends that each function must be construed; Industrial disagrees.   Third, the parties disagree on the corresponding structure that performs the multiple functions.

Thus, for each term purported to be a claimed function, the Court will first determine whether the term is a function of the signal receiving means and then, if required, construe the meaning of the words used to describe that function.  After identifying all claimed functions of the signal receiving means, the Court will determine the corresponding structure that performs those functions.  Notably, the parties have also identified—separate from and in addition to construing terms purported to be claimed functions—disputed terms within each one.  Such constituent disputed terms will be separately construed after the Court completes its means-plus-function analysis for "signal receiving means" for claims 1 and 53.

As a threshold matter, the Court notes that Static's means-plus-function analysis is unclear.  Specifically, means-plus-function construction mandates a two-step approach—first, identify the claimed functions; second, identify the corresponding structure—but Static's briefs do not distinguish these steps.  As a result, it is unclear whether Static's proposed constructions relate to a claimed function, a corresponding structure, or both.  The Court deciphers these proposals based on its review of the briefs and oral arguments.

### a.  <u>Claimed Functions</u>

### i.  Claim 1

Industrial asserts that claim 1 recites three functions.  The term "signal receiving means" appears in claim 1 below, with the purported claimed functions in bold:

1.  A toner cartridge adapted to fit within a toner cartridge-receiving cavity of a printer, comprising:
>    a waste bin;
>    a hopper;
>    a circuit board disposed to engage an electrical communication means within the toner cartridge-receiving cavity of a printer belonging to a family of printers;
>    a **signal receiving** means associated with said circuit board;
>    said signal receiving means associated with a data base of communication values for printer-cartridge interoperation with a plurality of printer families;
>    said signal receiving means adapted **to identify an electrical signal to determine the family of the host printer** from a plurality of families; and
>    said signal receiving means adapted **to communicate the correct value for printer-cartridge interoperation to the printer.**

'874 Patent, col. 26, line 64-col. 27, line 14.  Arguing that the claim language used to describe the recited functions requires no construction (other than construction of the separately identified constituent disputed terms), Industrial asserts that the signal receiving means must perform the following three claimed functions:

> (1) receive a signal;

> (2) identify an electrical signal to determine the family of the host printer from a plurality of families; and

> (3) communicate the correct value for printer-cartridge interoperation to the printer.

[Doc. 72 at 7; Doc. 79 at 5].  Static contends claim 1 recites four functions, bolded in the following portion of claim 1:

>    a **signal receiving** means associated with said circuit board;
>    said signal receiving means **associated with a data base of communication values for printer-cartridge interoperation with a plurality of printer families**;
>    said signal receiving means adapted **to identify an electrical signal to determine the family of the host printer** from a plurality of families; and
>    said signal receiving means adapted **to communicate the correct value for printer-cartridge interoperation to the printer**.

Further, Static asserts that each purported claimed function requires construction and construes those functions to mean:

(1) receives signals from mechanical switches or dials on the cartridge; [2]

(2) able to activate the printer using the correct electrical handshake and other required data after the printer family has been identified and the user employs the brand selector switch;

(3) to identify the family based on the presence or absence of signals from a combination of open and closed switches and location of printer contacts once the brand is identified by the user; and

(4) able to communicate the OEM data for a particular family and brand to the printer to permit printer-cartridge interoperation.

[Doc. 70 at 14].  The Court will address each purported claimed function.

### 1. "signal receiving means"

| Static | Industrial |
|---|---|
| *Claimed function*: "signal receiving" (no dispute) | *Claimed function*: "signal receiving" (no dispute) |
| *Construction of function*: "receives signals from microswitches or dials on the cartridge"[3] | *Construction of function*: "receive a signal"[4] |

The parties agree that "signal receiving" is the claimed function of the signal receiving means but disagree on how to construe the function.   The parties' primary disagreement on the construction of this term is based on Static's proposed limitation, "from microswitches or dials on the cartridge."

The explicit claim language does not support adding "from microswitches or dials on the cartridge."   The express text of the claim does not limit signals based on the transmitting structures.   As support for its construction, Static points to an embodiment and asserts that the

---

[2] In its claim construction brief, Static proposed construing "signal receiving means" to mean "a circuit board/electronic device on the toner cartridge that receives signals from mechanical switches or dials on the cartridge."  [Doc. 70 at 14].  However, Static does not specify whether this proposal relates to the claimed function, corresponding structure, or both.  Based on a review of Static's briefs and oral arguments, the Court determines that Static construes the "signal receiving" function to mean "receives signals from mechanical switches or dials on the cartridge."

[3] In its claim construction brief, Static proposed construction uses the word "mechanical switches."  [Doc. 70 at 14]. At the claim construction hearing, Static changed its proposal to use the word "microswitches."

[4] Industrial's claim construction briefs provide different but substantially similar proposed constructions of the "signal receiving" function: "receive signal," [Doc. 72 at 6], "receiving signals," [Doc. 72 at 7], and "receive a signal," [Doc. 79 at 5].

specification only discloses signals received from switches or dials on a printer cartridge.  [Doc. 70 at 14; Doc. 78 at 8].  However, "it is improper to narrow the scope of the function beyond the claim language." *Cardiac Pacemakers*, 296 F.3d at 1113.  The scope of the term depends on the claim, not a preferred embodiment. *See Kara Tech.,* 582 F.3d at 1347.  Patentees are not required to provide an example of every embodiment of a claimed structure in a specification.

Nothing in the specification shows any express disclaimer or independent lexicography that would justify adding the limitation proposed by Static.  *See Phillips,* 415 F.3d at 1316. Although the specification discloses an embodiment where switches or dials generate "[t]wo independently-generated electrical signals," the claim does not require the signal receiving means to only receive signals generated by switches or dials.  *See* '874 patent, col. 22, lines 12-13.  Further, the specification describes signals from structures other than switches and dials, such as a ribbon or circuit board.  *Id.* at col. 22, lines 10-39.  Courts "normally do not interpret claim terms in a way that excludes disclosed examples in the specification." *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1305 (Fed. Cir. 2007).

Based on a plain reading of the claim language, the function is to receive a signal. Static's proposed additional limitation lacks support in the claims or written description. Accordingly, the Court finds that "signal receiving" is a recited function of the signal receiving means and construes the term to mean "receive a signal."

2. **"associated with a data base of communication values for printer-cartridge interoperation with a plurality of printer families"**

| Static | Industrial |
|---|---|
| *Claimed function*: "associated with a data base of communication values for printer-cartridge interoperation with a plurality of printer families" | *Claimed function*:  Not a function. <br><br> *Construction of function*:  No construction required. |

| *Construction of function*: "able to activate the printer using the correct electrical handshake and other required data"[5] | |
|---|---|

Static contends the term, "associated with a data base of communication values for printer-cartridge interoperation with a plurality of printer families," is a recited function of the signal receiving means and requires construction.  [Doc. 78 at 8].  Industrial disagrees.

A plain reading of the claim language shows the term is not purely functional; rather, it is a separate limitation that is not subject to the means-plus-function claim.  *See Baran,* 616 F.3d at 1317 ("The relevant inquiry is whether the term at issue is purely functional."); *BBA Nonwovens Simpsonville, Inc. v. Superior Nonwovens. L.L.C.*, 303 F.3d 1332, 1344 (Fed. Cir. 2002) (portion of claim describing position of "corona means" is a separate limitation not subject to means-plus-function).   The expression following the phrase "associated with" describes to what the claimed means is related; it does not describe a function that the means must perform.

Notably, another element in claim 1 similarly states, "a signal receiving means associated with said circuit board."  '874 patent, col. 27, lines 4-5.  The term "associated with said circuit board" is not a recited function of the signal receiving means, nor does Static contend that it is.  For the same reason, "associated with a data base of communication values for printer-cartridge interoperation with a plurality of printer families" is not a recited function.

Further, the abstract states that "[t]he universal printer chip . . . selects the correct data . . . from the universal printer chip data base."  *Id*. at Abstract.  This supports the plain reading of the claim—that the signal receiving means is related to or is associated with a database.  *See Hill–Rom Co. v. Kinetic Concepts, Inc.,* 209 F.3d 1337, 1341 n.* (Fed. Cir. 2000) (courts "have

---

[5] In its claim construction brief, Static's proposed construction was "able to activate the printer using the correct electrical handshake and other required data after the printer family has been identified and the user employs the brand selector switch."  [Doc. 70 at 15]. At the claim construction hearing, Static changed its proposal by removing the phrase, "after the printer family has been identified and the user employs the brand selector switch."

frequently looked to the abstract to determine the scope of the invention" and are aware of no legal principle that would require disregarding the abstract to determine the "meaning of claims").   In contrast, Static's proposed construction changes the meaning of the term and has no support from the claim language or written description.

The Court notes that the constituent terms—"data base," "communication values," and "printer families"—have been separately identified by the parties as disputed terms requiring construction and will be separately addressed.   *See infra* §§ III.A.3-5.   Aside from these constituent terms, the Court finds "associated with a data base of communication values for printer-cartridge interoperation with a plurality of printer families" requires no construction because its plain and ordinary meaning is easily discernible from the claim language.

Accordingly, the Court finds that "associated with a data base of communication values for printer-cartridge interoperation with a plurality of printer families" is not a claimed function of the signal receiving means and requires no construction apart from the Court's separate construction of the constituent disputed terms.

### 3.   "to identify an electrical signal to determine the family of the host printer from a plurality of families"

| Static | Industrial |
|---|---|
| *Claimed function*: "to identify an electrical signal to determine the family of the host printer"[6] | *Claimed function*:  "to identify an electrical signal to determine the family of the host printer from a plurality of families" |
| *Construction of function*: "to identify the family based on the presence or absence of signals from a combination of open and closed switches and location of printer contacts"[7] | *Construction of function*:  No construction required. |

---

[6] In its initial claim construction brief, Static identified "to identify an electrical signal" as the recited function. [Doc. 70 at 16].  In its response brief, Static identified "to identify an electrical signal to determine the family of the host printer…" as the recited function.  [Doc. 78 at 9].

[7] In its claim construction brief, Static's proposed construction was "to identify the family based on the presence or absence of signals from a combination of open and closed switches and location of printer contacts once the brand is identified by the user."  [Doc. 70 at 16].  At the claim construction hearing, Static changed its proposal by removing the phrase, "once the brand is identified by the user."

The parties generally agree that the term recites a second function of the signal receiving means.  The Court agrees, because a plain reading of the claim language shows that "identify an electrical signal to determine the family of the host printer from a plurality of families" is the second recited function that clearly corresponds to the "signal receiving means."

The parties disagree on how to construe the function. Their primary disagreement stems from Static's proposed limitation, "based on the presence or absence of signals from a combination of open and closed switches and location of printer contacts."

Static's proposed construction lacks support in the claim language.  The express text of the claim does not limit the way in which the claimed means identifies the electronic signals or how the electronic signals are generated or transmitted.  Nothing in the specification shows any express disclaimer or independent lexicography that would justify adding the limitation proposed by Static.  No construction is required because its plain and ordinary meaning of the function is easily discernible from the claim language.

As support for its proposal, Static points to an embodiment and asserts that "[t]he specification discloses that electrical signals are transmitted from switches and dials on the cartridge to the circuit boards on the cartridge," and that "[t]his signal is generated through the absence or presence of signals from a combination of open and closed switches and the location contacts."  [Doc. 70 at 16].   This is improper for two reasons.  First, this seeks to import a limitation—generating or transmitting electrical signals—from an embodiment into the claimed function.  *See, e.g., Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1336 (Fed. Cir. 2006) ("the district court again erred by importing additional functions when it determined the way in which the disclosed embodiment performs the claimed . . . function").  Second, Static essentially starts with a structure and determines the function in light of that structure.  *See, e.g.*,

'874 patent, col. 22, lines 10-39 (disclosing an embodiment "where two independently-generated electrical signals" are transmitted by switches).  This is contrary to the rule of construction mandating that the claimed function must be determined before the corresponding structure.  By attempting to include a disclosed structure for transmitting and generating electrical signals, Static's proposed construction confuses function with structure.

Thus, the Court rejects Static's proposed construction because it lacks support in the intrinsic evidence.  The Court notes that the constituent term "family" has been separately identified by the parties as a disputed term requiring construction and will be separately addressed in its own section.  *See infra* § III.A.5.  Aside from this constituent term, the Court finds "to identify an electrical signal to determine the family of the host printer from a plurality of families" requires no construction because its plain and ordinary meaning is easily discernible from the claim language.

### 4.  "adapted to communicate the correct value for printer-cartridge interoperation to the printer"

| Static | Industrial |
|---|---|
| *Claimed function*: "to communicate the correct value for printer-cartridge interoperation to the printer"[8] (no dispute) | *Claimed function*:  "communicate the correct value for printer-cartridge interoperation to the printer" (no dispute) |
| *Construction of function*: "able to communicate the OEM data for a particular family and brand to the printer to permit printer-cartridge interoperation" | *Construction of function*:  No construction required. |

The parties agree that the term recites another function of the signal receiving means. The Court concurs, because a plain reading of the claim language shows that "to communicate the correct value for printer-cartridge interoperation to the printer" is a recited function that

---

[8] In its initial claim construction brief, Static identified "to identify an electrical signal" as the recited function. [Doc. 70 at 16].  In its response brief, Static identified "to identify an electrical signal to determine the family of the host printer." as the recited function.  [Doc. 78 at 9].

clearly corresponds to the "signal receiving means."

The parties disagree on how to construe the function. Although they request construction of the entire quoted phrase, it is clear that their dispute centers on the term "correct value" and Static's apparent attempt to construe it to mean "OEM data for a particular family and brand." There is no need to construe the entire phrase because the parties' dispute can be resolved by construing "correct value" alone. However, because Static has also separately identified and construed the term "correct value," the Court will not address "correct value" in this section but will address it separately in its own section. *See infra* § III.A.6.

The remainder of Static's proposed construction is a mere rewording of the claim language, which is clear enough without any alterations. Nothing in the claim language or the specification establishes the need for a special definition; therefore, the plain and ordinary meaning controls. No construction is required because its plain and ordinary meaning of the function is easily discernible from the claim language.

Accordingly, the Court finds that "communicate the correct value for printer-cartridge interoperation to the printer" is a recited function of the signal receiving means and, subject to the Court's discussion of the constituent term "correct value," requires no construction.

### ii. Claim 53

Claim 53 is similar to claim 1, except it is directed to interoperation with printer brands. Industrial contends there are two recited functions, bolded in claim 53 below:

> 53. A toner cartridge adapted to fit within a toner cartridge-receiving cavity of a printer, comprising:
> > a waste bin;
> > a hopper;
> > a circuit board disposed to engage an electrical communication means within the toner cartridge-receiving cavity of a printer belonging to a brand of printers;
> > a **signal receiving** means associated with said circuit board;

> said signal receiving means associated with data for printer-cartridge interoperation with a plurality of printer brands;
> said signal receiving means **adapted to communicate the correct value for printer-cartridge interoperation to the printer**.

'874 Patent, col. 33, line 39-col. 34, line 10 (emphases added).  Asserting that neither function requires construction, Industrial contends the two claimed functions are:

> (1) receive a signal; and

> (2) communicate the correct value for printer-cartridge interoperation to the printer.

[Doc. 79 at 5].  In contrast, Static contends there are three recited functions, bolded in the following portion of claim 53:

> a **signal receiving** means associated with said circuit board;
> said signal receiving means **associated with data for printer-cartridge interoperation with a plurality of printer brands**; and
> said signal receiving means adapted **to communicate the correct value for printer-cartridge interoperation to the printer.**

'874 Patent, col. 34, lines 1-10 (emphases added). Static asserts the functions should be construed to mean:

> (1) receive signals from microswitches or dials on the cartridge;

> (2) able to activate the printer using the correct electrical handshake and other required data after the printer family has been identified and the user employs the brand selector switch; and

> (3) able to communicate the OEM data for a particular family and brand to the printer to permit printer-cartridge interoperation.

[Doc. 78 at 7, 9-10].

### 1.  "signal receiving"

| Static | Industrial |
|---|---|
| *Claimed function*: "signal receiving" (no dispute) | *Claimed function*: "signal receiving" (no dispute) |
| *Construction of function*: "receive signals from microswitches or dials on the cartridge" | *Construction of function*: "receive a signal" |

For this term, the parties make the same arguments as provided for claim 1.  The Court's

previous discussion on those issues applies here.  *See supra* § III.A.1.a.i.1.  Accordingly, the

Court finds that "signal receiving" is a recited function of the signal receiving means and

construes the term to mean "receive a signal."

### 2. "associated with data for printer-cartridge interoperation with a plurality of printer brands"

| Static | Industrial |
|---|---|
| *Claimed function*: "associated with data for printer-cartridge interoperation with a plurality of printer brands"<br><br>*Construction of function*: "associated with specific OEM data allowing printer-cartridge interoperation for each individual brand of a group of printer brands when the user moves a switch on the cartridge to select the appropriate brand" | *Claimed function*: Not a function.<br><br>*Construction of function*:  No construction required. |

This claim 53 element is similar to the claim 1 element previously discussed.  *See supra* §

III.A.1.a.i.2.  Static again contends that "associated with data for printer-cartridge interoperation

with a plurality of printer brands" is a functional limitation and requires construction.

As discussed in claim 1, a plain reading of the claim language shows the term is not

purely functional; rather, it is separate limitation that is not subject to the means-plus-function

claim.  The remainder of the Court's previous discussion on this issue applies here.  *See supra* §

III.A.1.a.i.2.

Further, Static's proposed construction has no support in the claim language or written

description.  Adding the words "specific OEM" to describe the "data" adds nothing but

confusion to the construction of the term and would be an improper reading of a limitation from

the specification into the claim.  This limitation does not appear in the claim itself and nothing

suggests that the patentee intended to give "data" a construction narrower than the plain and

ordinary meaning of the term.  Likewise, adding "when the user moves a switch on the cartridge

to select the appropriate brand" would improperly import a temporal or structural limitation from an embodiment into the claimed function. Further, Static's proposed construction of "plurality of printer brands" to mean "for each individual brand of a group of printer brands" is at best a mere rewording of the claim language, which is clear enough without any alterations.

Thus, the Court rejects Static's proposed construction because it lacks support in the intrinsic evidence. The Court notes that the constituent term "printer brands" has been separately identified by the parties as a disputed term requiring construction and will be separately addressed in its own section. *See infra*, § III.A.7. Aside from this constituent term, the Court finds that the plain and ordinary meaning of "associated with data for printer-cartridge interoperation with a plurality of printer brands" is easily discernible from the claim language.

Accordingly, the Court finds "associated with data for printer-cartridge interoperation with a plurality of printer brands" is not a functional limitation and no construction is required other than the Court's construction of the constituent disputed term "printer brands."

### 3. "adapted to communicate the correct value for printer-cartridge interoperation to the printer"

| Static | Industrial |
|---|---|
| *Claimed function*: "to communicate the correct value for printer-cartridge interoperation to the printer" (no dispute) | *Claimed function*: "communicate the correct value for printer-cartridge interoperation to the printer" (no dispute) |
| *Construction of function*: "able to communicate the OEM data for a particular family and brand to the printer to permit printer-cartridge interoperation" | *Construction of function*: No construction required. |

For this term, the parties make the same arguments as provided for claim 1. The Court's previous discussion on those issues applies here. *See supra* § III.A.1.a.i.4. Accordingly, the Court finds that "communicate the correct value for printer-cartridge interoperation to the printer" is a recited function of the signal receiving means and, subject to the Court's discussion

of the constituent term "correct value," requires no construction.

### b. Corresponding Structure (Claims 1 and 53)

| Static | Industrial |
|---|---|
| "circuit board/electronic device on the toner cartridge"[9] | "printer controller electronics or universal printer chip"[10] |

Having determined the recited functions of the signal receiving means, the next step is to identify the corresponding structure in the written description that performs those functions. *Baran*, 616 F.3d at 1316. To summarize, the Court finds that the signal receiving means must perform the following two functions for claim 53: (1) receive a signal; and (2) communicate the correct value for printer-cartridge interoperation to the printer. For claim 1, the signal receiving means must, in addition to the above two functions, identify an electrical signal to determine the family of the host printer from a plurality of families. The Court notes the *Future Graphics* court similarly determined that "signal receiving means" had the above three functions in claim 1 and two functions in claim 53. [Doc. 72, Ex. D at 12-13].

The structure that performs and is clearly linked to these functions is "the printer controller electronics, or universal printer chip." *Omega Eng'g, Inc.,* 334 F.3d at 1321. In describing one embodiment, the specification discloses a structure that receives and identifies a signal to activate a printer family:

[A] toner cartridge-receiving printer cavity having a front-mounted, vertically disposed circuit board port **25** *c* and first and second protuberances **25** *a*, **25** *b*

---

[9] In its claim construction brief, Static proposed construing "signal receiving means" to mean "a circuit board/electronic device on the toner cartridge that receives signals from mechanical switches or dials on the cartridge." [Doc. 70 at 14]. However, Static does not specify whether this proposal relates to the claimed function, corresponding structure, or both. Based on a review of Static's briefs and oral arguments, the Court determines that Static identifies "circuit board/electronic device on the toner cartridge" as the corresponding structure.

[10] In its initial claim construction brief, Industrial identified "printer controller electronics or universal printer chip" as the corresponding structure. [Doc. 72 at 8]. In its response brief, Industrial identified "printer controller electronics, or universal printer chip, and equivalents thereof" as the corresponding structure. [Doc. 79 at 5]. The Court finds no substantial difference between these constructions because, by statute, a means-plus-function "claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. § 112, ¶ 6.

formed therein at opposite ends thereof as depicted in FIG. 16E is identified by contact with second switch actuator **132** which is positioned at the outboard edge of the novel universal waste bin as aforesaid. The switch associated with said actuator, when closed, sends a signal to the <u>printer controller electronics, or universal printer chip</u>, that activates a family of printers having said arrangement of first and second protuberances. In this example, the signal would activate any member of the 620 family of printers.

'874 patent, col. 23, lines 14-25 (emphasis added).  In describing a similar embodiment, the

specification states:

A toner cartridge-receiving printer cavity having a front-mounted, vertically disposed circuit board port **25** *c* and a centered protuberance **25** *e* formed therein as depicted in FIG. 16G is identified by contact with actuator switch **128** positioned in the center recess of the waste bin. Switch **126**, when closed, sends a signal to the <u>printer controller electronics, or universal printer chip</u>, that activates any member of the 520 family of printers.

*Id*. at col. 23, lines 59-66 (emphasis added).  Further, the specification discloses the structure that

performs the communication function:

A conductive ribbon **124** interconnects circuit board **110** and a microswitch having an actuator that is actuated when contacted by a protuberance formed in a printer. Thus, the protuberance depresses the actuator and the microswitch sends a signal that indicates the printer family through ribbon **124** to circuit board **110** that enables the operation of the cartridge in the printer.  Selector switch **120** *a* is also in electrical communication with circuit board **110**.  In this way, the signal carried to the circuit board by ribbon **124** tells circuit board **110** what family the printer belongs to and the user, by manipulating selector switch **120** *a*, tells the circuit board the brand name of the printer within the family.  So that the correct communication occurs, the brand and family information are then sent to an <u>electronic device, not shown</u>, that would be mounted on circuit board **110**. This semi-automatic switching system allows a cartridge to determine within which particular printer it has been installed.

*Id*. at col. 22, lines 17-39 (emphasis added).  The abstract comports with the specification and

describes the structure that can identify a signal and communicate the correct data:

A toner cartridge with a <u>universal printer chip</u> that can interpret a signal, identifying a family of printers.  The <u>universal printer chip</u> then selects the correct data for the identified printer from the universal printer chip data base. The printer may then be activated with the correct electrical handshake and other required data.

*Id.* at Abstract (emphases added).  Thus, "the printer controller electronics, or universal printer chip" is the structure that performs, and is clearly linked to, the functions of receiving a signal, identifying a signal to determine the printer family, and communicating the correct value for printer-cartridge interoperation to the printer.

Static provides little explanation for what "circuit board/electronic device" means in its proposed construction.  The circuit board is not the corresponding structure because it is not clearly linked to the claimed functions.  Although the circuit board can receive a signal, *see id.* at col. 22, lines 23-25, the specification does not clearly link or associate the circuit board with the function of communicating the correct value to the printer.  *Id.* at col. 22, lines 34-37 ("[s]o that the correct communication occurs, the brand and family information are then sent to an electronic device . . . that would be mounted on circuit board").

Further, the structure and language of claims 1 and 53 indicate that the circuit board cannot provide the structure corresponding to the "signal receiving means."   The claim language of the element—"a signal receiving means associated with said circuit board"—also indicates that the signal receiving means is not the same as, but is associated with, the circuit board.  *See id.* at col. 27, lines 4-5; *id.* at col. 35, lines 1-2.  Further, the term "signal receiving means" and the term "circuit board" are in different elements of the same claim.  *See id.* at col. 27, lines 1-5; *id.* at col. 33, line 35-col 34, lines 1-2.  This indicates that the circuit board and signal receiving means exist separately.   *See, e.g., Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1300 (Fed. Cir. 2005) (finding that the point-of-sale assembly was not the corresponding structure for the dispensing means where the two were recited in different parts of the same claim).

Accordingly, the Court finds that the corresponding structure of the signal receiving

means is the "printer controller electronics or universal printer chip."

### 2. "circuit board" (Claims 1 and 53)

| Static | Industrial |
|---|---|
| "a sheet of insulating material carrying circuit elements and terminals so that it can be inserted in an electronic apparatus (as a computer)" | No construction required. |

Although the parties agree that the term "circuit board" should be construed to have its plain and ordinary meaning, Static proposes a dictionary definition, contending that construction would be helpful to jurors who are unfamiliar with the meaning of circuit board. Industrial does not propose its own construction but opposes Static's construction.

The term "circuit board," which the specification does not define, has a plain and ordinary meaning, and here, the patentee has used the term in a manner consistent with its ordinary meaning. Static's dictionary definition would be unhelpful to a juror, because the terms "insulating," "circuit elements," and "terminals" would themselves require additional construction. Other definitions for "circuit board" include: "a sheet of fiberglass or other material on which electronic components, as printed or integrated circuits, are installed,"[11] or "an insulated board on which electronic components and their interconnecting circuits are mounted or etched."[12] These definitions are consistent with the use of the term in the patent.

Accordingly, the Court construes "circuit board" to mean a "board on which electronic components are installed." *See, e.g., Eolas Techs. Inc.* v. *Microsoft Corp.,* 399 F.3d 1325, 1336-37 (Fed. Cir. 2005) (affirming trial court's construction based on its consideration of several dictionary definitions); *see also Tex. Digital Sys., Inc.,* 308 F.3d at 1203 ("If more than one

---

[11] TheFreeDictionary.com, www.thefreedictionary.com/circuit+board (citing *Kernerman Webster's College Dictionary* (Random House 2010) (last visited June 3, 2013)).
[12] *Id*. (citing *American Heritage Dictionary of the English Language* (Houghton Mifflin Company 2000) (last visited June 3, 2013)).

dictionary definition is consistent with the use of the words in the intrinsic record, the claim terms may be construed to encompass all such consistent meanings.").

### 3. "data base" (Claim 1)

| Static | Industrial |
|---|---|
| "a usually large collection of data organized especially for rapid search and retrieval (as by a computer)" | "collection of specific information" |

Although the parties agree that the term "data base" should be construed to have its plain and ordinary meaning, they disagree on how to construe the term. Industrial opposes Static's construction as being unduly restrictive. Static simply asserts that its proposed construction, which relies on a dictionary definition, is more appropriate.

At the outset, the Court questions the need to consult a dictionary to determine the meaning of this term. *See C.R. Bard,* 388 F.3d at 863 (courts "regularly forgo detailed dictionary analyses if the term is . . . commonplace . . . and determine the ordinary meaning of terms without referring to a dictionary"). The term "data base" has a plain and ordinary meaning, and the patentee has used the term in a manner consistent with that ordinary meaning.

Nonetheless, dictionaries define "database" as "any large store of information,"[13] or "[a] collection of data arranged for ease and speed of search and retrieval by a computer."[14] Static's dictionary definition essentially combines these two definitions. However, nothing in the patent indicates that "data base" must be "large" or used "especially for rapid search and retrieval." Further, Industrial points to a dictionary that defines "database" as "an organized body of related information." [Doc. 79 at 12].

---

[13] TheFreeDictionary.com, www.thefreedictionary.com/data+base (citing *Collins English Dictionary - Complete and Unabridged* (HarperCollins Publishers 2003)).
[14] *Id.* (citing *American Heritage Science Dictionary* (Houghton Mifflin Company 2005)).

The Court finds that Industrial's proposed construction—"collection of specific information"—encompasses all consistent meanings provided by the dictionaries and is supported by the specification.   *See Tex. Digital Sys., Inc.,* 308 F.3d at 1203; *see also Moba, B.V. v. Diamond Automation, Inc.,* 325 F.3d 1306, 1316-17 (Fed. Cir. 2003) (employing a broader definition where supported by the specification).   As used in claim 1, the term "data base" refers to a collection of specific information—*i.e.,* communication values for printer-cartridge interoperation with a plurality of printer families. The abstract, stating that "[t]he universal printer chip . . . selects the correct data . . . from the universal printer chip data base," also supports construing "data base" to mean a collection of specific information.   Further, the Court notes that the *Future Graphics* court construed "data base" to mean "collection of specific information."  [Doc. 72, Ex. D at 18].

Accordingly, the Court construes the term "data base" to mean "collection of specific information."

### 4.   "communication values" (Claim 1)

| Static | Industrial |
|---|---|
| "transmitted data" | No construction required.  If required, then "information to facilitate printer-cartridge interoperation" |

At the claim construction hearing, the parties did not object to the construction "data to be communicated."   Accordingly, the Court construes the term "communication values" to mean "data to be communicated."

### 5.   "family" or "printer families" (Claim 1)

| Static | Industrial |
|---|---|
| "a group of printer models that have the same shaped internal cartridge-receiving cavity and use printer cartridges that have the same physical shape" | "a collection or group of different printers or models that share common features or attributes" |

The parties' dispute centers on whether printers in the same printer family must have cartridge-receiving cavities with the same physical shape.

Static contends that the specification, which describes the number and location of protrusions in the cartridge-receiving cavities of printer families, compels its proposed construction. [Doc. 70 at 18]. However, the specification describes members of the same printer family with different cartridge-receiving cavity shapes. In the "summary of the invention" section, the specification states that "[p]rinters in the 630 printer family have one protrusion that mates with the first leading edge protrusion," but "[p]rinters in the 632 and 634 sub-families have one protrusion that mates with the third leading edge recess." '874 patent, col. 7, lines 1-7.

Similarly, in the "detailed description of the preferred embodiment" section, the specification illustrates printers in the same family having cavities with protrusions at different locations. *Id.* at col. 23, lines 41-511; *id.* at col. 24, lines 13-22. Figures 16F and 16H each depict a printer that is a member of the 630 family, but Figure 16F shows a cartridge-receiving cavity with a "left of center protrusion" and Figure 16H shows a cavity with a "right of center protrusion." *Id.* at col. 23, lines 42-43; *id.* at col. 24, line 15. Thus, Static's proposed construction improperly precludes preferred embodiments from the scope of the claim. *See Verizon Servs.,* 503 F.3d at 1305 ("We normally do not interpret claim terms in a way that excludes disclosed examples in the specification.").

Industrial's proposed construction is supported by the specification's description of printer families as consisting of different printer models that share common features. *See, e.g.,* '874 patent, col. 23, lines 14-40; *id.* at col. 24, lines 57-61. The Court notes that the *Future Graphic* court also construed "data base" to mean "a collection or group of different printers or models that share common features or attributes." [Doc. 72, Ex. D at 19]. The Court adopts

Industrial's proposed construction, except that the Court does not use the phrases "different printers" and "different printer models" interchangeably.  The specification shows that printers in the same family are made up of different printer models, not just different printers. *See, e.g., id.* at col. 24, lines 57-61.

Accordingly, the Court construes "family" or "printer families" to mean "a group of different printer models that share common features."

### 6. "correct value" (Claims 1 and 53)

| Static | Industrial |
|---|---|
| "data that matches the data required by an OEM printer microcontroller for a particular printer brand and family" | No construction required.  If required, then "a value that facilitates printer-cartridge interoperation" |

As support for its proposed construction, Static argues that the term "correct value" is included in a means-plus-function limitation and thus must be construed to include "the structures disclosed in the specification for reaching the 'correct value.'"  [Doc. 78 at 14-15].

Static's argument fails for two reasons.  First, Static's argument is premised on its contention that the term "correct value" is part of a means-plus-function limitation where "reaching the correct value" is the claimed function.  However, the claimed function is to "communicate the correct value for printer-cartridge interoperation."  Second, Static's argument confuses function and structure.  A claimed function must be determined before the corresponding structure, but Static improperly combines these two steps by including structure in the construction of the purported claimed function.

Next, Static argues that the patentee has acted as its own lexicographer and the patentee's definition supports construing the term "correct value" to mean "data that matches the data required by an OEM printer microcontroller for a particular printer brand and family."  [Doc. 78 at 14].  However, this argument fails because the specification does not use, much less reveal a

special definition for, the term "correct value."   Where the specification neither contains a restrictive definition nor disavows a broader interpretation of the term, the ordinary meaning governs.

To this end, Static argues that its proposed construction is supported by dictionary definitions of the words "correct" and "value."  Regarding the word "value," Static proposes the synonym "data." At the claim construction hearing, Industrial did not oppose construing "value" to mean "data."  Thus, the parties' dispute centers on whether and how to construe the word "correct."  Static cites to a dictionary defining "correct" to mean "conforming to an approved or conventional standard," "conforming to or agreeing with fact, logic, or known truth," or "conforming to a set figure." [Doc. 70 at 20; Doc. 78 at 15, n.6].  However, Static does not explain the wide gap between the cited dictionary definitions and its proposed construction, and the Court declines to adopt it.

The word "correct" is clear and nothing in the claim language or the specification necessitates a special definition.  Thus, the plain and ordinary meaning controls.  No construction is required because its plain and ordinary meaning of the function is easily discernible from the claim language.  Further, the specification uses the word "correct" in a manner consistent with its ordinary meaning. *See* '874 patent, col. 22, lines 34-36 ("[s]o that the correct communication occurs, the brand and family information are then sent to an electronic device"); *id.* at col. 25, lines 3-7 ("the printer may then be activated with the correct electrical handshake and other required data"); *id.* at Abstract ("[t]he universal printer chip then selects the correct data for the identified printer").  Accordingly, the Court construes "correct value" to mean "correct data."

### 7. "brand" or "printer brands" (Claim 53)

| Static | Industrial |
|---|---|
| "the brand name under which the printer is sold, e.g., Source Technologies, Lexmark, IBM" | "a commercial identifier of a printer with a corresponding electronic identifier" |

Industrial contends that "brand" should not be construed based on the name under which the printer is sold, but should instead be construed to mean a "commercial identifier of a printer with a corresponding electronic identifier." This construction is not helpful, because the terms "commercial identifier" and "corresponding electronic identifier" would require additional construction. Nor do these terms have support in the specification.

Where the specification neither contains a restrictive definition nor disavows a broader interpretation of the term, the plaint and ordinary meaning governs. One dictionary defines "brand" as "an arbitrarily adopted name that is given by a manufacturer or merchant to an article or service to distinguish it as produced or sold by that manufacturer or merchant and that may be used and protected as a trademark."[15] This is consistent with the use of the term in the specification, which describes printers as being sold under different brand names:

> The 520 family includes printers sold under the brand names Lexmark®, Source Technologies®, Toshiba®, and IBM®. The 620 family includes printers sold under the same brand names as the 520 family . . . .

'874 patent, col. 24, lines 55-59; *see also id*. at col. 23, lines 11-12 ("identify the brand name of a printer within a family"). The Court finds that Static's proposed construction encompasses the plain and ordinary meaning of the term as used in the patent.

Accordingly, the Court construes the term "printer brands" to mean "the name under which the printer is sold."

---

[15] Merriam-Webster Collegiate Dictionary (11th ed.), www.merriam-webster.com/dictionary/brand%20name (last visited June 3, 2013).

### B. THE '279 PATENT

In the '279 patent, the parties dispute terms in claims 3, 4, and 10. Claim 3 states:

>   3. An electro-photographic cartridge adapted to fit within the electro-photographic cartridge-receiving cavity of an electro-photographic machine, comprising:
>      **a body sculpted to mate** with the electro-photographic cartridge receiving cavity of a plurality of electro-photographic machine **brands**;
>      a **microcontroller** adapted to enable interoperation between an **electro-photographic cartridge and an electro-photographic machine belonging to a plurality of electro-photographic machine brands.**

'279 patent, col. 8, lines 3-12 (emphases added).  Claim 4 states:

>   4. An electro-photographic cartridge adapted to fit within the electro-photographic cartridge-receiving cavity of an electro-photographic machine, comprising:
>      **a body sculpted to mate** with the electro-photographic cartridge receiving cavity of a plurality of electro-photographic machine **brands**;
>      a **microcontroller** disposed to electrically communicate with said electro-photographic machine;
>      said **microcontroller** associated with data **adapted to enable interoperation between an electro-photographic cartridge and an electro-photographic machine belonging to a plurality of electro-photographic machine brands.**
>      said **microcontroller** adapted to communicate said data to said electro-photographic machine to enable interoperation between said electro-photographic cartridge and said electro-photographic machine.

'279 patent, col. 8, lines 13-29 (emphases added). Claim 10 states:

>   10. A method for enabling interoperation between an electro-photographic cartridge and an electro-photographic machine, said method comprising the steps of:
>      providing an electro-photographic cartridge having a **microcontroller** disposed to electrically communicate with said electro-photographic machine;
>      said **microcontroller** associated with data **adapted to enable interoperation between an electro-photographic cartridge and an electro-photographic machine belonging to a plurality of electro-photographic machine brands**; and
>      communicating said data to said electro-photographic machine to enable interoperation between said electro-photographic cartridge and said electro-photographic machine.

'279 patent, col. 10, lines 11-26 (emphases added).

### 1. "a body sculpted to mate" (Claims 3 and 4)

| Static | Industrial |
|---|---|
| "a body having an original shape that fits properly with more than one printer family receives signals from an outside source and transmits signals to an outside source" | No construction required. |

Although Static identifies the phrase "a body sculpted to mate" as requiring construction, the parties dispute whether and how to construe "sculpted to mate." The term "sculpted to mate" does not appear in the specification, but Static contends that the prosecution history of the parent patent, the '608 patent, compels its construction.[16] The Court disagrees.

During the prosecution of the '608 patent, the patentee responded to a patent rejection by distinguishing its patent from prior art based on the word "sculpted." [Doc. 70, Ex. 9 at 23]. Specifically, the patentee stated that its invention disclosed a toner cartridge that did not need to be modified or altered prior to being inserted into the printer, whereas prior art invented a cartridge that had to be structurally modified before insertion. [*Id*. at 22]. In construing "sculpted" to mean "having an original shape," Static's proposed construction does not clarify this issue. Arguably, it adds confusion by suggesting that the body could take on a shape other than its original one.

Nor does Static's proposed construction of "mate" find support in the prosecution history. Specifically, the prosecution history does not address whether a cartridge "fits properly with more than one printer family receives signals from an outside source and transmits signals to an outside source." Not only does this proposed construct lack in the claim language or the specification, it adds confusion given that claims 3 and 4 relate to printer brands, not families.

Nothing in the claim language or the specification necessitates a special definition for "sculpted to mate" and therefore, the plain and ordinary meaning controls. Dictionary

---

[16] The '279 patent is a continuation of the '774 patent, which is a continuation-in-part of the '608 patent.

definitions of "sculpted" include "carved or molded into a particular shape from wood, stone, clay, etc." or "made into a particular shape by someone or something."[17] A dictionary definition of "mate" is "to join or connect (things) together."  The Court finds that no construction of "sculpted to mate"[18] is required because its plain and ordinary meaning is easily discernible from the claim language.

Accordingly, the Court finds that "a body sculpted to mate" requires no construction.

### 2.  " microcontroller" (Claims 3, 4, and 10)

| Static | Industrial |
|---|---|
| "an electronic device capable of storing information that receives signals from an outside source and transmits signals to an outside source" | "Any system, device, or execution unit with added functionality capable of implementing the method as described. The microcontroller must be capable of storing information, receiving signals originated from an outside source, and transmitting signals to an outside source." |

In the '279 patent, the patentee acted as its own lexicographer by providing an explicit definition of the claim term "microcontroller" in the specification:

> The term "microcontroller" is any system, device, or execution unit with added functionality capable of implementing the method as described. Accordingly, the "microcontroller" must be capable of storing information, receiving signals originated from an outside source, and transmitting signals to an outside source. Although it is preferred, it is not necessary that the "microcontroller" be implemented on a single monolithic integrated circuit.

'279 patent, col. 3, lines 4-51.  The parties do not dispute that the patentee's definition governs construction of the term. However, Static's proposed construction changes the patentee's definition by ignoring words and phrases used by the patentee. Thus, the Court declines to adopt Static's construction.

---

[17] Merriam-Webster Learner's Dictionary, www.learnersdictionary.com/search/sculpted (last visited June 3, 2013).
[18] Merriam-Webster Learner's Dictionary, www.learnersdictionary.com/search/mate (last visited June 3, 2013).

Accordingly, the Court construes the word "microcontroller" to mean "any system, device or execution unit with added functionality capable of implementing the invention, and accordingly, must be capable of storing information, receiving signals originated from an outside source, and transmitting signals to an outside source."

3. "an electro-photographic cartridge and an electro-photographic machine belonging to a plurality of electro-photographic machine brands" (Claims 3, 4, and 10)

| Static | Industrial |
|---|---|
| "a printer toner cartridge and printer that belongs to (is one of) one of a multiple brands of printers" | No construction required. |

Industrial not object to Static's proposal to substitute "printer" for "electro-photographic," with the caveat that "printer" would take on the same meaning as specially defined in the '279 patent.  [Doc. 79 at 20].  Specifically, the patentee's explicit definition of "printer" includes "electro-photographic":

> As used herein, the term "printer" refers to any image forming apparatus that accepts the use of a toner cartridge. Examples include, but are not limited to, printers or copying machines or other electro-photographic devices.

'279 patent, col. 4, lines 40-44.  Industrial reiterated this at the claim construction hearing.  Static did not object.  Thus, the Court construes "an electro-photographic cartridge and an electro-photographic machine" to mean "printer cartridge and printer."

The parties dispute whether and how to construe "belonging to a plurality of . . . brands." Static's construction is neither helpful nor necessary, and the Court declines to adopt it.  The term's plain and ordinary meaning is easily discernible from the claim language.  Thus, no further construction is required.

Accordingly, the Court construes "an electro-photographic cartridge and an electro-photographic machine belonging to a plurality of electro-photographic machine brands" to mean "a printer cartridge and printer belonging to a plurality of printer brands."

### 4. "brands" (Claims 3, 4, and 10)

For this term, the parties make the same arguments as they made with respect to "printer brands" in the '874 patent. Nothing in the claim language or the specification of the '279 patent indicates that the patentee intended to depart from the ordinary meaning of the term. Accordingly, Court's prior construction, "the name under which the printer is sold," applies here. *See supra* § III.A.7.

### 5. "associated with data adapted to enable interoperation between an electrophotographic cartridge and an electro-photographic machine belonging to a plurality of electro-photographic machine brands" (Claims 4 and 10)"[19]

| Static | Industrial |
|---|---|
| "associated with specific OEM data allowing printer-cartridge interoperation for each individual brand of a group of printer brands when the user moves a dial on the cartridge to select the appropriate brand" | No construction required. |

Although Static identifies the entire phrase as requiring construction, the Court has already construed "an electro-photographic cartridge and an electro-photographic machine belonging to a plurality of electro-photographic machine brands." Within the remaining portion of the phrase, the parties' dispute centers on whether and how to construe "data."

Static supports limiting "data" to "specific OEM data" with the following language from the specification of the '279 patent: "The inventive method incorporates a microcontroller that

---

[19] Although Static's claim construction briefs state that the disputed term appears in claim 3, the Court finds that it appears in claim 4. In its claim construction briefs, Static stated that the disputed term was "associated with data adapted to enable interoperation between an electro-photographic cartridge and an electro-photographic machine belonging to a plurality of electro-photographic machine brands." [Doc. 70 at 21; Doc. 78 at 15-16]. Static confirmed this at the claim construction hearing. This term appears in claim 4, not claim 3, of the '279 patent.

emulates an OEM-PC and is able to transmit the necessary data to communicate with the printer being used." [Doc. 70 at 21 (citing '279 patent, col. 3, lines 38-41)].  However, this cited portion of the specification does not support limiting "data" to "specific OEM data."  Nor does any other part of the specification or claim language support adding the "specific OEM" modifier.  The term "data" is used generally throughout the patent, and the Court declines to "add a narrowing modifier before an otherwise general term that stands unmodified in a claim."  *Renishaw PLC v. Marposs Societa' per Azioni,* 158 F.3d 1243, 1249 (Fed. Cir. 1998).

Further, Static points to the specification as support for adding the limitation, "when the user moves a dial on the cartridge to select the appropriate brand."  This would improperly import a limitation from the specification that does not appear in the claims, and the Court rejects it as unsupported by the intrinsic evidence.

Accordingly, the Court finds that no further construction of "associated with data adapted to enable interoperation between an electro-photographic cartridge and an electro-photographic machine belonging to a plurality of electro-photographic machine brands" is required.

## C.  THE '859 PATENT

In the '859 patent, claim 28 is at issue and provides:

28. A method of communicating an authentication code for a toner cartridge to a printer, comprising the steps of:
>   providing a toner cartridge having a **microcontroller** in **bidirectional communication** with said printer when the cartridge is installed in the printer;
>   providing **an authentication code adapted for interoperation with printers in a plurality of geographic regions** in association with the microcontroller; and
>   **transmitting** the authentication code to the processor.

'859 patent, col. 10, lines 42-50 (emphases added).

### 1. "microcontroller"

In the '859 patent, the patentee provides the same definition set forth in the '279 patent, '859 patent, col. 4, lines 5-12, and the parties provide the same arguments here.  Accordingly, the same construction applies here.  *See supra* § III.B.2.

### 2. "bidirectional communication"

| Static | Industrial |
|---|---|
| "two-way exchange of information" | "electronic signals capable of being sent, received, or conveyed between two devices or units" |

At the claim construction hearing, the parties did not object to the construction "two-way communication."   Accordingly, the Court construes the term "bidirectional communication" to mean "two-way communication."

### 3. "geographic region"

| Static | Industrial |
|---|---|
| "country" | "a region or segment of the world defined by a printer manufacturer"[20] |

Static proposes construing "a geographic region" to mean "a country" based on the following portion of the "background of the invention" section describing the problem of regional lockout:

> Regional lockout is the programming practice, code, chip, or physical barrier used to prevent the playing of media designed for a device from the country where it is marketed on the version of the same device marketed in another country.

'859 patent, col. 1, lines 38-42.

However, the Court finds that the specification does not support narrowly construing "a geographic region" to a country.  The specification shows that geographic regions are defined

---

[20] In its claim construction brief, Industrial's proposed construction was "a region or segment of the world defined by a printer manufacturer for employing a regional lockout." [Doc. 79 at 12]. At the claim construction hearing, Industrial stated that "for employing a regional lockout" was not necessary to its proposed construction.

not by countries but by a manufacturer's decision to segment the world.  The specification states

that manufacturers segment the world into different regions:

> Manufacturers utilize regional lockout to segment the world into different regions, and then only sell a particular region's model (and, of course, region-encoded media) in that area. As a result, makers and distributors of electronic devices are able to gouge consumers by charging more in some regions than they do in others. Consumers are harmed because an inexpensive device made in one region cannot, in theory, be used in a more expensive market.

*Id.* at col. 1, lines 47-49; *see also id.* at col. 1, lines 47-53 ("Regional lockout usually uses

manufacturer-specific hardware that is instructed to operate only with consumables designated

for a particular region, and that region is then encoded onto the consumable.").  The specification

then discloses an invention that addresses the "need to extend the universality of the chip to

allow the manufacture of a single cartridge that can be used in multiple geographic regions." *Id.*

at col. 1, lines 58-60.

Accordingly, the specification supports construing a "geographic region" to mean "a

segment of the world as defined by a printer manufacturer."

### 4. "an authentication code adapted for interoperation with printers in a plurality of geographic regions"

| Static | Industrial |
|---|---|
| "a single universal authentication code that works in printers in more than one geographic region"[21] | "code adapted to facilitate printer-toner cartridge" |

Although the parties identify the entire phrase as requiring construction, their proposed

constructions reveal that their dispute centers on whether "authentication code" should be

narrowly construed to mean a single authentication code that works worldwide.

---

[21] In its claim construction brier, Static's proposed construction was "a single universal MAC that works in printers in more than one country." [Doc. 70 at 23]. At the claim construction hearing, Static changed its proposal to "a single universal authentication code that works in printers in more than one geographic region."

Industrial argues that the claim requires the authentication code to work in multiple geographic regions, but not every region.  [Doc. 79 at 19 ("[t]here is also no support for insertion of the term "single" . . . [because] an authentication code may be 'operable in multiple regions,' but it does not say every region")].  Industrial similarly opposed the addition of "single universal" at the claim construction hearing, reiterating that an authentication code may work in some but not other regions.  Static responded that construction is required to clarify whether the scope of the claim included an authentication code that allowed all cartridges to work in all of a manufacturer's geographic regions, or even worldwide.

However, the specification clearly addresses the authentication code's scope of operability. The surrounding claim language—"interoperation with printers in a plurality of geographic regions"—is clear that an authentication code must enable operation in multiple, not all, geographic regions.  The written description also shows that the concept of universality relates to the ability to work in multiple geographic regions.  Specifically, the "background of the invention" section states that the invention addresses the "need to extend the universality of the chip to allow the manufacture of a single cartridge that can be used in multiple geographic regions." '859 patent, col. 1, lines 58-60. The "summary of invention" section describes an embodiment where "the microcontroller on the cartridge is associated with an authentication code that is operable in multiple regions." *Id.* at col. 3, lines 8-10.  This "universal authentication code is communicated regardless of the geographic region." *Id.* at col. 3, lines 12-13.

Nothing in the claim or written description requires an authentication code to work with printers in every geographic region or worldwide.  Thus, the Court declines to adopt Static's proposed "single universal" addition.

As for Industrial's proposed construction, it inexplicably eliminates "authentication" and "in a plurality of geographic regions." The Court finds no support for this proposed construction. Further, it would broaden the scope of the claim to include an authentication code that can only activate printers in one single geographic region. This is contrary to the plain language of the claim, which provides that an authentication code must enable operation with printers in multiple geographic regions, not every or a single geographic region.

For the remaining portion of the disputed term, "adapted for interoperation with printers in a plurality of geographic region," the parties' proposed constructions merely reword the claim language, which is clear enough without any alterations. Further, the Court has already construed "geographic region." *See supra* § III.C.3. Accordingly, the Court finds that "an authentication code adapted for interoperation with printers in a plurality of geographic regions," requires no further construction.

### 5.  Transmitting

| Static | Industrial |
|---|---|
| "actively sending" | No construction required. If it is, "convey or communicate" |

In its claim construction briefs, Static identified the claim term "transmitting" as requiring construction. [Doc. 70 at 22]. However, at the claim construction hearing, Static changed its position and stated that no construction was required. Accordingly, the Court declines to construe the term "transmitting."

## IV.   CONCLUSION

Accordingly, it is ORDERED AND ADJUDGED that the claims, terms, and phrases of the patents-at-issue are construed as set forth above. A chart summarizing the Court's constructions is attached to this Order.

**DONE AND ORDERED** at Tampa, Florida, this 3rd day of June, 2013.

SUSAN C. BUCKLEW
United States District Judge

Copies to: Counsel of Record

Attachment: Chart