**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

INDUSTRIAL ENGINEERING &
DEVELOPMENT, INC., *et al.*,

                Plaintiffs,

v.                                  Case No. 8:12-cv-691-T-24-MAP

STATIC CONTROL COMPONENTS,
INC.,

                Defendant.
_____/

## ORDER

This cause comes before the Court on a Motion for Summary Judgment filed by Plaintiffs Industrial Engineering & Development Inc., Innovative Cartridge Technologies, Inc., Cartridge Corporation of America, Inc., American Imaging Cartridge, LLC, and Universal Imaging Holdings, LLC. (Dkt. 153) Defendant Static Control Components, Inc. opposes. (Dkt. 177) A hearing on Plaintiffs' motion was held on August 12, 2014.

## I.     BACKGROUND

### A.     Patents-in-Suit

This patent case relates to printer chips used in remanufactured toner cartridges to enable printer-cartridge interoperation. Steven Miller, the president or managing member of each Plaintiff, (Dkt. 133), is the inventor or co-inventor of Plaintiffs' patents-in-suit, which teach systems or methods for enabling a remanufactured printer toner cartridge to operate with a plurality of different printers. Each of Plaintiffs' patents-in-suit is a continuation of U.S. Patent No. 7,136,608 ("the '608 patent"), titled "Removable Toner Cartridge Universal Adapter."[1]

---

[1] The '608 patent's filing date is December 19, 2003, and publication date is November 14, 2006.

U.S. Patent No. 7,286,774 ("the '774 patent"), titled "Universal Printer Chip," is a continuation-in-part of the '608 patent.  U.S. Patent No. 7,187,874 ("the '874 patent"), titled "Toner Cartridge Having A Printer-Detecting Universal Printer Chip," is a divisional application claiming the benefit of the '608 patent.  U.S. Patent No. 7,356,279 ("the '279 patent"), titled "Universal Imaging Cartridge," is a continuation of the '774 patent.  U.S. Patent No. 7,221,886 ("the '886 patent"), titled "Electrical connections for circuit boards on universal toner cartridges," is a divisional application claiming the benefit of the filing date of the '608 Patent.  U.S. Patent No. 7,551,859 ("the '859 patent"), titled "Multiple Region Printer Chip," is a continuation-in-part of the '774 patent and the '874 patent.

Similarly, Static's patents-in-suit teach systems and methods for printer cartridges that operate with multiple types of printers.  U.S. Patent No. 7,088,928 ("the '928 patent"), and its continuation, U.S. Patent No. 7,254,346 ("the '346 patent"), are titled "Systems and Methods for Universal Imaging Components."

### B.      Prior Litigation

In 2004 and 2005, before the issuance of the patents-in-suit, Static sued Miller and several entities related to Miller for, *inter alia*, copyright infringement.[2]  (Dkt. 153-5)  Static alleged Miller copied Static's computer code for printer chips intended for use with Lexmark T520/522 and T620/622 printer cartridges.   (*Id.*) These lawsuits were consolidated and transferred to the Middle District of Florida in 2006.[3]

In March 2007, when several of Plaintiffs' and Static's patents-in-suit had been filed or had issued, the parties began settlement negotiations.  On November 26, 2007, the parties to

---

[2] *Static Control, Inc. v. Intersolution Ventures, et al.*, No. 1:04-cv-00443-FWB (M.D.N.C.), and *Static Control, Inc. v. Miller et al.*, No. 1:05-cv-401 (M.D.N.C.).
[3] *Static Control, Inc. v. Intersolution Ventures, et al.*, No. 8:06-CV-1364 (M.D. Fla.).

Static's lawsuit, along with each Plaintiff in this lawsuit, executed a settlement agreement. On the same day, Static and Plaintiffs executed a cross-license agreement for the issued patents-in-suit,[4] which was consideration for, and integral to, the settlement agreement:

> In consideration for this Settlement Agreement and Release, and as an integral part hereof, the Parties have this day, contemporaneous with the execution of this Agreement, executed a Cross License Agreement of certain patents and technologies, a copy of which is attached hereto as Exhibit 3.

(Settlement Agmt. ¶ 3.1)  Pursuant to the cross-license agreement, Plaintiffs granted Static a non-exclusive, royalty-bearing license to practice certain technology that infringes on Plaintiffs' '774, '874, and '886 patents or any patent claiming priority to those patents.  (License Agmt. ¶ 2.1.2) Static likewise granted Plaintiffs a non-exclusive, royalty-bearing license to practice certain technology infringing on Static's '928 and '346 patents.  (*Id.* ¶ 2.1.1)

Further, the cross-license agreement contains a no-challenge clause, providing that "[n]o party shall file an action contesting the validity of patent rights . . . owned by the other party." (*Id.* ¶ 2.2.6)

### C.   Procedural History

On March 30, 2012, Plaintiffs initiated this lawsuit by filing a one-count complaint alleging that Static breached the cross-license agreement by failing to pay royalties.  (Dkt. 1) Static answered and asserted several affirmative defenses alleging, *inter alia*, that Plaintiffs' patents-in-suit are "invalid for failure to satisfy one or more of the conditions of patentability specified in Parts II or III of Title 35 of the United States Code" (second affirmative defense) and unenforceable because Plaintiffs paid small entity maintenance or issue fees despite knowing that large entity fees were due (fourth affirmative defense).  (Dkt. 25; *see also* Dkt. 91)

---

[4] By November 26, 2007, Plaintiffs' '774, '874, and '886 patents and Static's '928 and '346 patents had issued.

Static also alleged multiple counterclaims.  Static's first counterclaim for declaratory judgment alleges that Static has not infringed any valid claims of the patents-in-suit.  (Dkt. 91 ¶¶ 17-20)  Specifically, Static alleges there is a justiciable controversy concerning the validity of claim 53 of the '874 patent, claim 10 of the '279 patent, and claim 28 of the '859 patent.  (*Id*.)  In its second counterclaim for breach of the cross-license agreement, Static alleges that Plaintiffs breached the cross-license agreement by improperly assigning the '859 patent and licensing the patents-in-suit to third parties. (*Id*. ¶¶ 21-39)  Its third counterclaim for breach of warranty alleges that Plaintiffs' breached the cross-license agreement's warranty that "Miller conceived, invented and developed" the licensed technology because "Miller knew he did not conceive of at least one claim in the '874 Patent, a claim to a cartridge chip that would work in multiple brands without using a switch." (*Id*. ¶¶ 41, 44)  Its fourth counterclaim for unenforceability alleges that Plaintiffs' patents-in-suit are unenforceable because Plaintiffs paid small entity maintenance or issue fees despite knowing that the large entity fees were due.  (*Id*. ¶¶ 47-61)  Its fifth counterclaim for unenforceability alleges that Plaintiffs failed to pay the proper maintenance fees to the United States Patent & Trademark Office ("PTO"), and asserts Static's right to pay the proper fees and obtain ownership of Plaintiffs' patents-in-suit under the cross-license agreement. (*Id*. ¶¶ 47-61)

Plaintiffs moved to dismiss Static's first, third, and fourth counterclaims and to strike Static's second and fourth affirmative defenses, contending these were invalidity challenges that were barred by the cross-license agreement's no-challenge clause.  (Dkt. 30)  Static responded that the no-challenge clause was void under the public policy set forth in *Lear v. Adkins,* 395 U.S. 653 (1969), because the cross-license agreement was not part of an agreement to settle patent litigation.  (Dkt. 33)  Static also argued that the terms of the no-challenge clause, if

enforceable, did not bar any of its affirmative defenses and counterclaims.  The Court denied

Plaintiffs' motion to dismiss and strike, finding it required considering issues outside the

pleadings and should instead be resolved at summary judgment.  (Dkt. 46)

In May 2013, despite maintaining its position that patent validity challenges were barred,

Plaintiffs filed an amended complaint to add count II, seeking a declaratory judgment that

Static's '928 and '346 patents are invalid.  (Dkt. 86)  Following briefing and two *Markman*

hearings, the Court issued claim construction orders construing disputed terms in Plaintiffs' '874,

'279, and '859 patents, and Static's '928 and '346 patents.  (Dkts. 111, 113, 117)

In March 2014, Static moved to dismiss count II of Plaintiffs' amended complaint for

lack of subject matter jurisdiction, which this Court denied.  (Dkts. 127, 238)  In May 2014,

Plaintiffs filed a motion for summary judgment as to several claims, counterclaims, and

affirmative defenses, arguing that:

- The cross-license agreement's no-challenge clause is enforceable and therefore bars Static's first, third, and fourth counterclaims, Static's second and fourth affirmative defenses, and count II of Plaintiffs' amended complaint;

- Summary judgment should be granted as to Static's fourth counterclaim and fourth affirmative defense, because Static cannot prove Plaintiffs knowingly defrauded the PTO;

- Summary judgment should be granted as to Static's fifth counterclaim, because Plaintiffs paid the proper maintenance fee;

- Allegations regarding the '774 and '886 patents should be dismissed for lack of subject matter jurisdiction;

- As to count I of Plaintiffs' amended complaint, the Court should find that Static's multi-brand cartridge chips—LT640, LT630, LT688, and LX 342 (the "accused chips")— infringe claim 53 of the '874 patent; and

- As to count II of Plaintiffs' amended complaint (in the event the Court finds that the no-challenge clause is unenforceable under *Lear*), the Court should find claim 8 of the '928 patent and claims 1, 7, and 16 of the '346 patent are invalid.

(Dkt. 153)

## II.      STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court must draw all inferences from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor.  *See Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006) (citation omitted).  The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.  *See id.*  When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings and, by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial.

## III.     DISCUSSION

### A.  <u>No-Challenge Clause</u>

Plaintiffs contend the cross-license agreement's no-challenge clause bars Plaintiffs' count II, Static's first, third, and fourth counterclaims, and Static's second and fourth affirmative defenses.  Plaintiffs argue that the clause bars either party from challenging the validity of each others' patents, and that the clause is enforceable under *Lear v. Atkins,* 395 U.S. 653 (1969), because the cross-license agreement is part of an agreement to settle prior litigation between Static and Miller.

Static responds that the no-challenge clause is unenforceable, because: (1) the no-challenge clause is part of a stand-alone license agreement, not a settlement agreement; and (2) the settlement agreement resolved non-patent litigation, not patent litigation.  Further, Static

argues that even if the no-challenge clause is enforceable, its affirmative defenses and counterclaims are not barred under the terms of the clause.

       1.    <u>Enforceability of the No-Challenge Clause</u>

Prior to *Lear*, courts generally prevented licensees from denying the validity of licensed patents under the doctrine of licensee estoppel.  "The theory underlying this doctrine was that a licensee should not be permitted to enjoy the benefits of the agreement while simultaneously urging that the patent forming the basis of the agreement is void."  *Flex-Foot, Inc. v. CRP, Inc.,* 238 F.3d 1362, 1368 (Fed. Cir. 2001).

In *Lear*, the United States Supreme Court abrogated the licensee estoppel doctrine, holding that "the important public interest in permitting full and free competition in the use of ideas" outweighed "the technical requirements of contract doctrine."  395 U.S. at 670.  "Under *Lear*, a licensee of a patent is not estopped from challenging the validity of the licensed patent by virtue of the license agreement."  *Baseload Energy, Inc. v. Roberts,* 619 F.3d 1357, 1361 (Fed. Cir. 2010).

In subsequent cases, the Federal Circuit identified situations where, despite *Lear,* a licensee could not challenge the validity of licensed patents.[5]  In *Flex-Foot*, the Federal Circuit distinguished *Lear*, noting that the license agreement in *Lear* was neither created as part of a litigation settlement nor "accompanied by[] any promise by the licensee not to challenge the validity of the patent."  238 F.3d at 1368.  These distinguishing facts were meaningful because they implicated "the strong public interest in enforcing settlements."  *Id.* at 1370; *see also id.*

---

[5] Federal Circuit law applies to issues regarding the enforceability of the no-contest clause.  *See Flex-Foot, Inc. v. CRP, Inc.*, 238 F.3d 1362, 1365 (Fed. Cir. 2001) ("[W]hether public policy precluding patent license estoppel should extend to a waiver of validity challenges in a settlement agreement[ ] is intimately related with the substance of enforcement of a patent right. Therefore, we will apply our law to these issues.").

("Upholding the terms of settlement agreements encourages patent owners to agree to settlements and promotes judicial economy."). Determining that the use-of-ideas policy articulated in *Lear* must yield to the policy of enforcing settlements, *Flex-Foot* held that a licensee's clear and unambiguous waiver of the right to challenge the validity of licensed patents—if entered into as part of an agreement to settle litigation—would contractually estop the licensee from challenging the licensed patent's validity in the future:

> Once an accused infringer has challenged patent validity, has had an opportunity to conduct discovery on validity issues, and has elected to voluntarily dismiss the litigation with prejudice under a settlement agreement containing a clear and unambiguous undertaking not to challenge validity and/or enforceability of the patent-in-suit, the accused infringer is contractually estopped from raising any such challenge in any subsequent proceeding.

*Id*.

Here, Static contends the no-challenge clause is not part of an agreement to settle litigation, because the clause appears in the cross-license agreement, which is separate from the settlement agreement. The Court disagrees. Not only were the settlement and cross-license agreements executed contemporaneously, but the settlement agreement also expressly incorporates the cross-license agreement. (Settlement Agmt. ¶ 3.1) Further, the settlement agreement states that the cross-license agreement was consideration for the parties' settlement agreement. (*Id*.) Thus, the cross-license agreement's no-challenge clause was part of Static's agreement to settle its litigation against Miller.

Static also contends *Rates Technology Inc. v. Speakeasy, Inc*., 685 F.3d 163 (2d Cir. 2012) shows that the no-challenge clause is not part of a settlement agreement and therefore unenforceable under *Lear*. But *Rates* is factually distinguishable from this case. The parties in *Rates* entered into an agreement containing a no-challenge clause <u>prior</u> to any litigation. 685 F.3d at 171-73. The Second Circuit declined to follow the Federal Circuit decisions upholding

no-challenge clauses based on the strong public interest in settling litigation. *Id*. at 172. *Rates* is inapplicable where, as here, the no-challenge clause was part of an agreement to settle ongoing litigation.

Next, Static argues that the no-challenge clause is unenforceable because in this case, unlike *Flex-Foot*, patent infringement or invalidity issues were not litigated in the prior settled lawsuit. But the Federal Circuit has explained that, "even if invalidity claims had not been previously at issue and had not been actually litigated" in the lawsuit underlying the settlement agreement, contractual estoppel under *Flex-Foot* could still apply. *Baseload*, 619 F.3d at 1363; *see also Panduit Corp. v. HellermannTyton Corp.*, 2004 WL 1898954, at *3 (N.D. Ill. Aug. 11, 2004) (enforcing a settlement's no-challenge clause even where all of the *Flex-Foot* factors were absent, finding that "the Federal Circuit did not list the [*Flex-Foot*] factors to serve as a 'test' for use in future litigation").

Notably, at the time the settlement and cross-license agreement was drafted and executed, *Flex-Foot* had already established that a no-challenge clause entered in connection with a settlement of litigation would be enforceable. In settling its litigation over its printer chips, Static could have preserved its right to challenge, without limitation, the validity of the licensed patents. But Static instead agreed that the cross-license agreement and its no-challenge clause would be consideration for, and a part of, its settlement agreement. Under Federal Circuit precedent, the no-challenge clause is enforceable.

## 2. Scope of the No-Challenge Clause

The Court must next determine whether the no-challenge clause's "clear and unambiguous" terms bar Plaintiffs' count II, Static's second and fourth affirmative defenses, and Static's first, third, and fourth counterclaims. The no-challenge clause states in full:

> Patent Validity.  No party shall **file an action contesting the validity of patent rights** with respect to the Technology owned by the other party.  Nothing in this provision shall prevent either party from raising issues that may reflect on the validity of the other's patents in a defense of their own patent rights.  Likewise, nothing in this provision shall prevent either party from raising issues that may reflect on the validity of the other's patents in responding to office actions in the prosecution of their own patents, or in defending their own patent positions in any proceeding in the U.S. Patent Office or courts.

(License Agmt. ¶ 2.2.6) (emphasis added).

The parties primarily dispute how to interpret the language, "file an action."  Plaintiffs interpret this language as barring a party from filing "an independent cause of action seeking affirmative relief."  (Dkt. 153 at 12 n.7)  According to Plaintiffs, this means the following are barred:  count II of Plaintiffs' amended complaint, Static's second and fourth affirmative defenses, and Static's second, third, and fourth counterclaims.

Static appears to interpret "file an action" as solely barring a party from initiating litigation regarding patent invalidity, and would not bar affirmative defenses or counterclaims raised in a defensive posture.  Static also contends a counterclaim is not an action, but a claim within an action.  Static argues that it did not violate the no-challenge clause, because it did not initiate this litigation by filing a declaratory judgment claim challenging the validity of Plaintiffs' patents; rather, it filed its affirmative defenses and counterclaims after Plaintiffs initiated this lawsuit for unpaid royalties.

The Court agrees with Plaintiffs that a reasonable interpretation of "file an action" is "file an independent cause of action seeking affirmative relief."  Under this interpretation, a licensee is barred from filing a claim or counterclaim challenging the validity of the licensed patents or the patent rights owned by a party.  The Court disagrees with Static's interpretation of "file an action," which essentially limits the clause as barring a plaintiff from initiating litigation by filing a declaratory judgment claim of patent invalidity.  If the parties had intended to limit the

clause to barring the initiation of litigation, they could have expressly used the language "initiate litigation"—as they did in another clause governing the enforcement of their patents against possibly infringing competitors.   *See* License Agmt. ¶ 2.5.3.1 ("Either party may initiate litigation against infringers . . . ."). Similarly, if the parties had intended to limit the clause to barring declaratory judgment claims of patent invalidity, the clause would not have included the broader language—"action contesting the validity of patent rights."

However, the Court disagrees with Plaintiffs' apparent position that "file an action" encompasses affirmative defenses. Unlike a claim or counterclaim, an affirmative defense is not an independent cause of action seeking affirmative relief.   And while accused infringers often assert patent invalidity as both an affirmative defense and a counterclaim, there is a distinction between the two forms.   Unlike a counterclaim, an affirmative defense is dependent on the plaintiff's claim and would be moot if the plaintiff's claim is dismissed or resolved in the defendant's favor. *See Wireless Ink Corp. v. Facebook, Inc.*, 969 F. Supp. 2d 318, 338-39 (S.D.N.Y. 2013) ("[W]here, as here, the issue of invalidity is raised solely as an affirmative defense, rather than as a counterclaim for declaratory judgment, a district court's resolution of the invalidity issue after a finding of non-infringement constitutes unnecessary dicta, if not, in certain circumstances, reversible error."); *Silicon Graphics, Inc. v. ATI Techs., Inc.*, 2011WL322664, at *3 (W.D. Wis. Jan. 31, 2011) ("One difference between a counterclaim and an affirmative defense is that resolution of a plaintiff's claim in favor of a defendant always moots the affirmative defense . . . ."). Thus, under the terms of the cross-license agreement's no-challenge clause, claims and counterclaims contesting the validity of the other party's patent rights are barred; affirmative defenses are not. Having interpreted the no-challenge clause, the Court rules as follows:

### a.   Count II of Plaintiffs' Amended Complaint

Plaintiffs admit that they filed count II of their amended complaint—a cause of action seeking a declaratory judgment that Static's patents-in-suit are invalid—in the event the cross-license agreement's no-challenge clause is found to be unenforceable under *Lear*.   In the event the no-challenge clause is found to be enforceable, however, Plaintiffs contend count II should be dismissed because the no-challenge clause bars the filing of any cause of action contesting the validity of the other party's patents.   The Court agrees.   Accordingly, Plaintiffs' motion for summary judgment is granted as to count II of Plaintiffs' amended complaint because it is barred by the no-challenge clause.

### b.   Static's First Counterclaim

Static's first counterclaim is a cause of action seeking a declaratory judgment that Static is not infringing on a valid patent.  (Dkt. 91 ¶¶ 17-18)  Similar to Plaintiffs' count II, Static's first counterclaim is barred because it is a cause of action contesting the validity of Plaintiffs' patents-in-suit.   Accordingly, Plaintiffs' motion for summary judgment is granted as to Static's first counterclaim because it is barred by the no-challenge clause.

### c.   Static's Third Counterclaim

In its third counterclaim, Static alleges Plaintiffs breached the cross-license agreement's warranty that Miller "conceived, invented and developed the Miller Technology."  (Dkt. 91 ¶ 41) Plaintiffs argue that the no-challenge clause bars the third counterclaim because it contests the validity of Plaintiffs' patents.   Specifically, Plaintiffs contend the third counterclaim is, in substance, challenging the patent's validity under 35 U.S.C. § 102(f), which provides that a person shall not be entitled to a patent if "he did not himself invent the subject matter sought to be patented."   *See Pannu v. Iolab Corp.*, 155 F.3d 1344, 1353 (Fed. Cir. 1998) (improper

inventorship under § 102(f) rendered a patent invalid).  In response, Static asserts that the third counterclaim is a claim for breach of warranty, not patent invalidity.

The Court agrees with Plaintiffs that Static's third counterclaim is a cause of action that is based on a challenge to the validity of Plaintiffs' patents.  As explained above, the no-challenge clause is not limited to a claim seeking a declaratory judgment of patent invalidity.  Static's third counterclaim is based on Static's allegation that "Miller observed that Lexmark print chips had the ability to work in other brand printers and Miller did not invent this feature," and that "Miller knew that he did not conceive of . . . a claim to a cartridge chip that would work in multiple brands without using a switch."  (Dkt. 91 ¶ 44)  This is substantively the same as Static's arguments regarding the invalidity of Plaintiffs' patents.  *See, e.g.,* Dkt. 164 at 18 (arguing claim 53 of the '874 patent is invalid because "Lexmark . . . sold chips that would work in more than one brand of printer more than a year before the priority date of this patent"); *id.* at 20 (arguing claim 53 of the '874 patent is invalid to the extent it covers chips that work in more than one brand without a user turning a switch to identify the brand).  Accordingly, Plaintiffs' motion for summary judgment is granted as to Static's third counterclaim because it is barred by the no-challenge clause.

### d.  Static's Fourth Counterclaim

Static's fourth counterclaim alleges that Plaintiffs' patents-in-suit are unenforceable because they paid small entity maintenance or issue fees despite knowing that large entity fees were due.  Plaintiffs do not explain how this counterclaim, which contests the enforceability—not validity—of Plaintiffs' patents, falls within the scope of the no-challenge clause.  Accordingly, Plaintiffs' motion for summary judgment is denied as to Static's fourth counterclaim.

*e.  Static's Affirmative Defenses*

As explained above, the no-challenge clause does not bar affirmative defenses. Accordingly, Plaintiffs' motion for summary judgment is denied as to Static's second and fourth affirmative defenses.

The Court notes that, at the summary judgment hearing, Plaintiffs' counsel advanced a new argument regarding Static's second affirmative defense (alleging Plaintiffs' patents-in-suit are invalid).  Specifically, Plaintiffs' counsel argued that the second affirmative defense fails because it is not a valid defense to Plaintiffs' breach of contract claim for royalties under the cross-license agreement.  According to Plaintiffs, pursuant to section 2.1.9 of the cross-license agreement, only a <u>finding</u> of invalidity by a court would release Static from its obligation to pay royalties.  *See* License Agmt. ¶ 2.1.9 (a finding that a patent claim is "expired, invalid or unenforceable" shall relieve the licensee of its obligation to pay royalties for the practice of that patent claim).  Plaintiffs' counsel asserted that there has been no such finding, and therefore Static cannot avoid its contractual obligation to pay royalties (despite Static's assertion that Plaintiffs' patents are invalid).  However, the Court declines to consider Plaintiffs' new argument at this time, because it was neither briefed in either party's summary judgment brief nor addressed by Static's counsel at the summary judgment hearing.  To the extent Plaintiffs intend to argue this at trial, the parties may submit trial briefs (prior to trial) providing their respective positions and legal arguments for the Court's consideration at trial.

**B.   <u>Static's Fifth Counterclaim</u>**

Plaintiffs move for summary judgment as to Static's fifth counterclaim for unenforceability.  In response, Static concedes that the issue raised by the fifth counterclaim is moot because Plaintiffs have now paid the large entity fees.  (Dkt. 177 at 18 n.8)

Accordingly, Plaintiffs motion for summary judgment is granted as to Static's fifth counterclaim.

### C.    Subject Matter Jurisdiction: Plaintiffs' '886 and '774 Patents

Plaintiffs contend the Court lacks subject matter jurisdiction over Static's claims that Plaintiffs' '886 and '774 patents are invalid, non-infringing, or unenforceable.[6]  Plaintiffs argue that no case or controversy exists because Plaintiffs have not alleged that Static infringes on those patents.

Static responds that it agrees that subject matter jurisdiction does not presently exist, and asserts that its claims regarding the '886 and '774 patents should be dismissed for the reasons stated in its motion to dismiss count II of Plaintiffs' amended complaint regarding the validity of Static's '928 and '346 patents.  But Static then asserts that, if the Court denies Static's motion to dismiss Plaintiffs' count II, the Court should also deny Plaintiffs' motion for summary judgment as to Static's claims regarding the '886 and '774 patents.

The fact that the Court has subject matter jurisdiction over Plaintiffs' claims regarding Static's patents is irrelevant to the Court's jurisdiction over Static's claims regarding Plaintiffs' patents.  Because Static agrees that subject matter jurisdiction does not presently exist over its invalidity, non-infringement, and unenforceability claims regarding the '886 and '774 patents, Plaintiffs' motion for summary judgment is granted as to those claims.

### D.    Static's Fourth Counterclaim and Fourth Affirmative Defense

Plaintiffs move for summary judgment as to Static's fourth counterclaim and affirmative defense, which allege that Plaintiffs' patents-in-suit are unenforceable because they defrauded the PTO by paying small entity fees, when large entity fees were due.

---

[6] Allegations regarding the '886 and '774 patents appear in Static's first, second, and fourth affirmative defenses, and static's first and fourth counterclaims.

Specifically, Static alleges Plaintiffs were required to file as a large entity and pay large entity fees for the licensed patents because Static employs more than 500 employees.  Static alleges that despite knowing this, Plaintiffs defrauded the PTO by misrepresenting that it qualified as a small entity and paying small entity fees.

Plaintiffs and Static agree that a claim for inequitable conduct requires clear and convincing evidence that "a specific individual (1) knew of the withheld material information or the falsity of the material misrepresentation; and (2) misrepresented this information with a specific intent to deceive the PTO." *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1329 (Fed. Cir. 2009).  However, they dispute whether Miller knew large entity fees were due because Static employed more than 500 people.  Upon review of the record, the Court finds genuine issues of material fact exist which preclude summary judgment.  Accordingly, Plaintiffs' motion is denied as to Static's fourth counterclaim and affirmative defense.

### E.     Count I of Plaintiffs' Amended Complaint

Plaintiffs move for summary judgment as to count I, seeking a finding that Static's Lexmark LT640, LT630, LT644 and LX342 chips ("the accused chips") infringe claim 53 of the '874 patent, and therefore are royalty-bearing under the cross-license agreement.  Specifically, Plaintiffs contend Static indirectly infringes under 35 U.S.C. § 271(b) (induced infringement) and 35 U.S.C. §271(c) (contributory infringement), because Static instructs its customers to attach the accused chips to printer cartridges, which necessarily directly infringes claim 53.   In response, Static argues that the accused chips do not infringe because: (1) they do not communicate a "correct value" to the printer, and (2) Plaintiffs entered into a settlement agreement with Lexmark in which Plaintiffs acknowledged that the '874 patent does not cover certain Lexmark chips, and the accused chips are the same as those Lexmark chips.

1.      Legal Framework: Infringement

A determination of infringement is a two-step process. *Wright Med. Tech., Inc. v. Osteonics Corp.,* 122 F.3d 1440, 1443 (Fed. Cir. 1997). The first step is claim construction, which is a question of law to be determined by the court.  *Id.* The second step is determining whether a particular device infringes a properly construed claim, which is generally a question of fact.  *Id.* The patentee has the burden of proving infringement. *Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 134 S. Ct. 843, 846, 849 (2014).

Infringement may be direct or indirect. To prove direct infringement of claim 53 of the '874 patent, Plaintiffs must establish by a preponderance of the evidence that claim 53 reads on the accused chips "literally or under the doctrine of equivalents."  *Cross Med. Products, Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1310 (Fed. Cir. 2005); *see also* 35 U.S.C. § 271(a).[7] "Literal infringement requires that each and every limitation set forth in a claim appear in an accused product." *Frank's Casing Crew & Rental Tools, Inc. v. Weatherford Int'l, Inc.,* 389 F.3d 1370, 1378 (Fed. Cir. 2004).  "Summary judgment on the issue of infringement is proper when no reasonable jury could find that every limitation recited in a properly construed claim either is or is not found in the accused device[.]" *PC Connector Solutions LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1364 (Fed. Cir. 2005).

There are two forms of indirect infringement—induced infringement under § 271(b)[8] and contributory infringement under § 271(c)[9]—both of which "depend[] upon the existence of direct

---

[7] "[W]hoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent." 35 U.S.C. § 271(a).
[8] "Whoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b).

infringement." *Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 774 (Fed. Cir. 1993); *Bennett Marine, Inc. v. Lenco Marine, Inc.,* 549 F. App'x 947, 957 (Fed. Cir. 2013) (reversing judgment of induced infringement where the court reversed the finding of direct infringement).   Induced infringement requires showing that: (1) there has been direct infringement, (2) the accused infringer's actions induced the infringing acts, and (3) the accused infringer knew, or should have known, that its actions would induce actual infringement.  *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1331 (Fed. Cir. 2010); *DSU Med. Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1303-06 (Fed. Cir. 2006).   Contributory infringement requires showing that: (1) there is direct infringement, (2) the accused infringer had knowledge of the patent, (3) the component has no substantial noninfringing uses, and (4) the component is a material part of the invention.  *See Fujitsu*, 620 F.3d at 1326.

2.   <u>Claim 53 of the '874 Patent</u>

The '874 patent, titled "Toner Cartridge Having A Printer-Detecting Universal Printer Chip," primarily teaches various features of a printer cartridge which enables the cartridge to operate with different printer families and brands.  Claim 53, a "brand claim," discloses:

> 53.  A toner cartridge adapted to fit within a toner cartridge-receiving cavity of a printer, comprising:
> > a waste bin;
> > a hopper;
> > a circuit board disposed to engage an electrical communication means within the toner cartridge-receiving cavity of a printer belonging to a brand of printers;
> > a signal receiving means associated with said circuit board;
> > said signal receiving means associated with data for printer-cartridge interoperation with a plurality of printer brands;

---

[9] "Whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer."  35 U.S.C. § 271(c).

said signal receiving means adapted to communicate the correct value for printer-
cartridge interoperation to the printer.

'874 Patent, col. 33, line 39-col. 34, line 10.

In its *Markman* order, the Court construed "signal receiving means" under the means-plus-function analysis, finding that the "printer controller electronics or universal printer chip" was the corresponding structure for the following two functions: (1) receive a signal; and (2) communicate the correct value for printer-cartridge interoperation to the printer. Further, the Court construed "brand" as "the name under which a printer is sold," and "correct value" to mean "correct data."

### 3.   The Accused Chips

Plaintiffs assert that the accused chips meet each limitation disclosed in claim 53. However, the Court finds that Plaintiffs have not met their initial burden of providing evidence showing the accused chips meet at least one of the limitations in claim 53 and therefore summary judgment is inappropriate. *See First Years, Inc. v. Munchkin, Inc.*, 575 F. Supp. 2d 1002, 1020 (W.D. Wis. 2008) (denying the plaintiffs' motion for summary judgment of infringement where they failed to provide "evidence that defendant's product met *each* claim limitation"). Specifically, Plaintiffs contend the limitation—"signal receiving means associated with data for printer-cartridge interoperation with a plurality of printer brands"—is met because "[t]he accused chips contain data in a programmable memory that permits the printer cartridge to interoperate with a plurality of printer brands." (Dkt. 153 at 23)  But Plaintiffs fail to provide evidence that the accused chips contain <u>data</u> permitting interoperation <u>with a plurality of printer brands</u>.

Plaintiffs primarily rely on Miller's declaration. That declaration states that the accused chips "contain data in their memory that permits interoperation." (Miller Decl. ¶ 4)  It also states that there is "data stored in the programmable memory within each of the accused chips." (*Id.*)

But neither of those statements addresses the portion of the claim limitation that requires data for interoperation "with a plurality of printer brands."  Nor does Miller's declaration address any of the three exhibits—data maps, packaging of the accused chips, and Static's 2011 catalog—that are attached to Plaintiffs' summary judgment motion in support of their argument that the accused chips are associated with data for interoperation with multiple printer brands.  (Dkts. 153-11, 153-12, 153-13)

The provided data maps are insufficient to discharge Plaintiffs' initial burden of demonstrating that the accused chips meet this limitation.  (Dkt. 153-13)  They consist of multiple pages showing different headings—*e.g.,* a "T630" heading, or a "T620" heading—with a list of data or code under each heading.  But Plaintiffs fail to cite to any testimony or evidence—whether in an affidavit, deposition, or expert report—linking these data maps to the accused chips.[10]  More importantly, Plaintiffs provide no testimony explaining what these data maps show and why they are evidence of data that enables interoperation with multiple printer brands.[11]  Absent any testimony explaining how these data maps are associated with the accused chips, and the meaning of the various headings and code, the Court cannot evaluate whether the data maps are relevant or probative.  *See Novartis Corp. v. Ben Venue Labs., Inc.*, 271 F.3d 1043, 1054 (Fed. Cir. 2001) (finding that it is the patentee's obligation to present a detailed basis of its evidence such that the district court can evaluate whether it supports a finding of infringement).

---

[10] Plaintiffs' motion contends there are "data maps associated with the signal receiving means for these chips demonstrat[ing] the printers contain data that enables interoperation with multiple brands."  (Dkt. 153 at 23)  But this assertion is attorney argument, unsupported by testimony or other evidence.

[11] At the summary judgment hearing, counsel for Plaintiffs asserted that the data maps show that the accused chips have "brand data."  Again, this is attorney argument.  Moreover, this does not explain why this brand data enables interoperation with multiple printer brands.

As for the packaging of the accused chips and Static's 2011 catalog, Plaintiffs contend they show the different printer brands with which the accused chips interoperate.  (Dkt. 153 at 23)  However, the parties' claim construction briefs disputed the construction of "brand," which the Court construed to mean "name under which the printer is sold."  Without testimony explaining that these exhibits in fact identify different names under which printers are sold, Plaintiffs' conclusion that they establish different "brands" is insufficient.  Further, even if these exhibits list multiple printer brands, there is still no evidence that this is because the accused chips are <u>associated with data</u> that would enable interoperation with those printer brands.

Plaintiffs have not met their initial burden of establishing that the accused chips are associated with data for printer-cartridge interoperation with a plurality of printer brands.  Accordingly, Plaintiffs' motion for summary judgment as to count I of their amended complaint is denied.

### 4.   Correct Value

Although the Court denies Plaintiffs' summary judgment motion for the reasons stated above, the Court finds it is necessary to address the parties' arguments concerning another limitation in claim 53.

In their motion for summary judgment, Plaintiffs argue that the accused chips meet the limitation—*said signal receiving means adapted to communicate the correct value for printer-cartridge interoperation to the printer*—because "[a]fter receiving a request from a printer, the accused chips respond by calculating the correct response to the printer's request and then communicating the correct value to the printer."  (Dkt. 153 at 23 (citing Miller Decl. ¶¶ 3-4))   In response, Static contends if "correct value" means "any data that results in a working chip," then Static concedes that the accused chips meet this limitation.

Nevertheless, Static goes on to argue that "correct value" means something narrower and therefore the accused chips do not infringe.  Specifically, Static contends "correct value" means "printer OEM brand data for a particular chip."  (Dkt. 177 at 20)  Under its construction, Static contends the accused chips do not infringe because they do not return different brand data to match the brand data of the printer in which the chip is installed.  Rather, the communicated value is either: (1) "brand override data," which instructs the printer to disregard the brand data; or (2) Lexmark brand data, which enables interoperation with certain non-Lexmark printer brands that accept Lexmark brand data.

Static's argument is based on its proposed construction of "correct value," which the Court rejected in its *Markman* order.  Specifically, in its claim construction briefs, Static argued that "correct value" should be construed to mean "data that matches the data required by an OEM printer microcontroller for a particular printer brand and family."  (Dkt. 70 at 19-20; Dkt. 78 at 14-15)[12] Static asserted that its proposed construction was supported by select portions of the specification (which Static quoted without analysis) and by the dictionary definition of "correct."  (Dkt. 70 at 20)

Plaintiffs, in turn, argued that Static's proposed construction imposed limitations that were not supported by the specification and that required additional explanation (*e.g.*, what "OEM printer microcontroller" means).  (Dkt. 79 at 13-14)  Plaintiffs contended "correct value" required no construction, but that, if one is required, it should be construed to mean "a value that facilitates printer-cartridge interoperation operation."  (*Id.*; *see also* Dkt. 72 at 9-10)

---

[12] Static also argued in its claim construction brief that "associated with data for printer-cartridge interoperation with a plurality of printer brands" should be construed to mean "associated with specific OEM data allowing printer-cartridge interoperation for each individual brand of a group of printer brands when the user moves a switch on the cartridge to select the appropriate brand." (Dkt. 70 at 17)

In its *Markman* order, the Court recognized that the parties' disagreement turned on the meaning of "correct."  (Dkt. 93 at 26-27)  The Court rejected Static's proposed definition, finding that it was not supported by the specification.  The Court also declined to construe "correct" using the proposed dictionary definitions, finding that the term "correct" was clear in the context of the claim language and the specification.  After rejecting Static's proposed construction, the Court found that no further construction of "correct" was required.  However, upon review of the parties' summary judgment briefs, the Court now finds it is necessary to clarify its claim construction regarding "correct value."  *See Conoco, Inc. v. Energy & Envtl. Intern., L.C.,* 460 F.3d 1349, 1359 (Fed. Cir. 2006) ("[A] district court may engage in claim construction throughout litigation, not just in a *Markman* order."); *Jack Guttman, Inc. v. Kopykake Enterprises, Inc.*, 302 F.3d 1352, 1361 (Fed. Cir. 2002).

In its claim construction briefs, Static proposed a construction that limited the scope of "correct value" to a particular type of data—data that <u>matches</u> "data required by an OEM printer microcontroller for a particular printer brand."  (Dkt. 170 at 19)  In rejecting Static's proposed construction as unsupported by the specification, the Court implicitly declined to limit the scope of "correct" data in this manner.  The specification of the '874 patent discloses a cartridge that has a signal receiving means, which receives brand information and then communicates data to the printer to enable printer-cartridge interoperation.[13]  The specification does not specify or disavow any particular type of data that is communicated or otherwise explain how the

---

[13] *See* '874 Patent, col. 22, ll. 34-39 ("So that the correct communication occurs, the brand and family information are then sent to an electronic device, not shown, that would be mounted on circuit board 110."); *id*. at col. 25, ll. 2-7 ("[W]hen the user identifies the brand name of the printer in a particular family, the electronic circuitry then knows both the family and the printer within that family and the printer may then be activated with the correct electronic handshake and other required data."); *id*. at Abstract ("The universal printer chip then selects the correct data for the identified printer from the universal printer chip data base.  The printer may then be activated with the correct electrical handshake and other required data.").

communicated data activates the printer.  Instead, the communicated data is "correct" because it enables printer-cartridge interoperation.   Notably, this aligns with Plaintiffs' proposed construction for "correct value" set forth in their claim construction brief: "a value that facilitates printer-cartridge interoperation."  (Dkt. 79 at 13-14)  The Court now clarifies that it agrees with Plaintiffs' proposed construction—that "correct value" means "data that facilitates printer-cartridge interoperation."

Although the Court previously found that no further construction was needed after it rejected Static's proposed construction of "correct value," the parties' summary judgment briefs indicate the term should be clarified for the purposes of trial.  Accordingly, the Court construes "correct value" to mean "data that facilitates printer-cartridge interoperation."

## IV.    CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** that Plaintiffs' Motion for Summary Judgment (Dkt. 153) is **GRANTED IN PART AND DENIED IN PART** as follows:

A.  With respect to Count I of Plaintiffs' Amended Complaint, Plaintiffs' motion is **DENIED**;

B.  With respect to Count II of Plaintiffs' Amended Complaint, Plaintiffs' motion is **GRANTED** because it is barred by the cross-license agreement.

C.  With respect to Static's First Counterclaim, Plaintiffs' motion is **GRANTED** because it is barred by the cross-license agreement.

D.  With respect to Static's Third Counterclaim, Plaintiffs' motion is **GRANTED** because it is barred by the cross-license agreement.

E.  With respect to Static's Fourth Counterclaim, Plaintiffs' motion is **DENIED**.

F.  With respect to Static's Fifth Counterclaim, Plaintiffs' motion is **GRANTED**.

G.  With respect to Static's Second Affirmative Defense, Plaintiffs' motion is **DENIED**.

H.  With respect to Static's Fourth Affirmative Defense, Plaintiffs' motion is **DENIED**.

I.  With respect to Static's invalidity, non-infringement, and unenforceability claims regarding the '886 patent and '774 patent, Plaintiffs' motion is **GRANTED** because the Court lacks subject matter jurisdiction over those claims.

**DONE AND ORDERED** at Tampa, Florida, this 25th day of August, 2014.

SUSAN C. BUCKLEW
United States District Judge

Copies To: Counsel of Record